## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PAUL F. KILMER,
      Plaintiff

      v.

U.S. CUSTOMS AND BORDER PROTECTION,
      Defendant

Civil Action No. 17-1566 (CKK)

## MEMORANDUM OPINION
(May 14, 2021)

This lawsuit arises from a Freedom of Information Act ("FOIA") request made by *pro se* Plaintiff Paul Kilmer to Defendant U.S. Customs and Border Protection ("CBP"). Currently before the Court are Defendant CBP's [19] Motion for Summary Judgment and Plaintiff's [20] Cross-Motion for Summary Judgment. Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as whole, for the reasons stated below, the Court will **GRANT IN PART** and **DENY IN PART** CBP's Motion for Summary Judgment, and will **GRANT IN PART** and **DENY IN PART** Plaintiff's Cross-Motion for Summary Judgment.

## I.   BACKGROUND

On January 21, 2017, individuals from around the country traveled to Washington, D.C. and other major American cities to participate in a demonstration known as the "Women's March." Pl.'s Stmt. of Facts, ECF No. 20-2, at ¶ 31. Following the event, select news outlets reported that

---

[1] The Court's consideration has focused on the following documents:

- Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 19;
- Pl.'s Mem. of P. & A. in Supp. of Cross-Mot. for Partial Summ. J. ("Pl.'s Cross-Mot."), ECF No. 20-1;
- Def.'s Reply Mem. in Supp. of Def.'s Mot. & in Opp'n to Pl.'s Cross-Mot. ("Def.'s Reply"), ECF No. 25; and,
- Pl.'s Reply Mem. in Supp. of Cross-Mot. for Partial Summ. J. ("Pl.'s Reply"), ECF No. 27.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

CBP officials had denied entry to Canadian citizens at the border, after learning of their intention to join the Women's March. *See* Kilmer Decl., Ex. 1, ECF No. 20-4, at 8–14. Two members of Congress subsequently raised these reports to the Secretary of Homeland Security, expressing their concerns that CBP officials had improperly denied entry to Canadian citizens on the basis of political affiliations. *See id.*

Plaintiff, himself, participated in the Women's March in Washington, D.C. on January 21, 2017. *See* Kilmer Decl., ECF No. 20-3, at ¶ 2. According to Plaintiff, there is "reason to believe" that CBP officers denied Canadian citizens entry into the United States "based upon their espoused intent to participate in Women's March events." Pl.'s Stmt. of Facts, ECF No. 20-2, at ¶ 28. Plaintiff further contends that these denials implicated his First Amendment right to associate with "certain residents of Canada and certain United States citizens traveling with them" who were unable to join the Women's March on January 21, 2017. Kilmer Decl., ECF No. 20-3, at ¶ 2.

On January 29, 2017, Plaintiff filed a FOIA request with CBP. Therein, Plaintiff requested "documents"[2] regarding CBP's interactions with Canadian citizens seeking entry into the United States to participate in the Women's March. Def.'s Stmt. of Facts, ECF No. 19, at ¶ 1. Plaintiff's

---

[2] In his FOIA request to CBP, Plaintiff defined "documents" as:

"[T]he term 'documents' as used herein shall mean and include not only physical documents printed or reduced to writing but also electronic records of any description, photographs, videos, sound recordings or other means by which information or images may be stored and/or reproduced, in addition to email and other forms of electronic communication of any description including, but not limited to, text messages and messages sent via any form of social media. The term 'documents' shall also mean and include records of verbal communications (whether such communications occurred in face-to-face meetings or discussions or via telecommunications devices or facilities), instructions, minutes, reports, calendar entries, inter-office communications, bulletins, circulars, statements, manuals, summaries, maps, charts, graphs or statistical material or information. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or nonidentical copy is also to be considered a separate document." Suzuki Decl., ECF No. 19-1, Ex. A, at 1.

FOIA request covered a three-day period in 2017 from January 19th through January 21st.  *See*

Suzuki Decl., ECF No. 19-1, at ¶ 5.  In total, Plaintiff's FOIA request comprised six categories:

1) "Documents referring to, relating to or mentioning the Women's March (or Women's Marches) scheduled to be held on January 21, 2017, that also mention or refer to persons entering or who might enter the United States from Canada."

2) "Documents mentioning, referring to or otherwise relating to any person or persons denied entry to the United States from Canada on January 19, January 20 or January 21, 2017, including the reason or reasons such persons were denied entry to the United States."

3) "Documents consisting of, referring to or relating to orders, directives, guidance or suggestions of any nature that persons attempting to enter the United States from Canada on January 19, January 20 or January 21, 2017 should be barred from entry if such persons might be entering the United States to participate in the Women's March."

4) "Documents consisting of, referring to or relating to communications (verbal or in writing) from any person or persons alleging that they were denied entry into the United States from Canada on January 19, January 20 or January 21, 2017."

5) "Documents consisting of a report, memorandum or communication from any official, officer, employee or contractor of the CBP regarding persons denied entry to the United States from Canada on January 19, January 20 or January 21, 2017."

6) "Documents consisting of, including or mentioning any communications (verbal or in writing) from officials or employees of any branch, division, agency or other body of the government of Canada, or any Province or municipality thereof, regarding allegations that persons were denied entry to the United States from Canada on January 19, January 20 or January 21, 2017."

Suzuki Decl., ECF No. 19-1, Ex. A, at 1–2.

In March 2017, CBP provided its initial response to Plaintiff's FOIA request, explaining

that the agency had conducted a comprehensive records search, but had not identified any records

responsive to Plaintiff's request.  *See* Compl., ECF No. 1, at ¶¶ 6–10; Pl.'s Stmt. of Fact, ECF No.

20-2, at ¶ 32.  Plaintiff then filed internal FOIA appeals with CBP on April 8, 2017, and again on

June 10, 2017.  *See* Compl., ECF No. 1, at ¶¶ 9–12.  CBP, however, did not respond to either of

Plaintiff's internal appeals.  *See* Pl.'s Stmt. of Fact, ECF No. 20-2, at ¶ 33.  On August 2, 2017,

Plaintiff commenced this civil action, seeking to compel CPB to produce documents responsive to his FOIA request.  *See* Compl., ECF No. 1, at ¶¶ 34–37.  Thereafter, CBP conducted additional searches and produced 937 pages it identified as responsive to Parts One, Two, and Five of Plaintiff's FOIA request.  Suzuki Decl., ECF No. 19-1, at ¶ 6.  CBP, however, still "did not locate any records responsive to Parts Three, Four, and Six of the request."  *Id.*  On the 937 pages produced, CBP made redactions, pursuant to FOIA exemptions (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E).  *Id.* ¶ 29.  CBP did not withhold any responsive documents in full.  *Id.*

CBP has now moved for summary judgment, arguing that the agency "has conducted a reasonable search for responsive records, and has produced all nonexempt, segregable documents subject to FOIA."  Def.'s Mot. at 1.  In response, Plaintiff has filed a cross-motion for summary judgment, wherein he maintains that "CBP has failed to conduct appropriate searches for records responsive to [his] Request, failed to produce relevant records reasonably available to it, claimed FOIA Exemptions that do not apply to records and portions of records subject to the Request, and failed to properly segregate and produce documents and portions of documents called for by the Request."  Pl.'s Cross-Mot. at 4.   Plaintiff requests that the Court order CBP "to conduct a full and appropriate search for records relevant" to his FOIA request, review the agency's redactions under the claimed FOIA exemptions, and evaluate the agency's segregability obligations.  *Id.*  Plaintiff also asks the Court to reserve his ability "to conduct limited discovery in the event there is reason to doubt CBP has complied with its responsibilities under FOIA."  *Id.*  The parties' cross-motions are now fully briefed and ripe for this Court's review.

## II.    LEGAL STANDARD

Congress enacted the Freedom of Information Act, 5 U.S.C. § 552, to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  *Dep't of Air*

*Force v. Rose*, 425 U.S. 352, 361 (1976) (citation omitted).  Nonetheless, Congress also balanced this objective of transparency with the potential that "legitimate governmental and private interests could be harmed by release of certain types of information."  *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992) (en banc) (citation omitted), *cert. denied*, 507 U.S. 984 (1993).  To that end, FOIA "requires federal agencies to make Government records available to the public, subject to nine exemptions for categories of material." *Milner v. Dep't of Navy*, 131 S. Ct. 1259, 1261-62 (2011).  Ultimately, "disclosure, not secrecy, is the dominant objective of the act."  *Rose*, 425 U.S. at 361.  For this reason, the "exemptions are explicitly made exclusive, and must be narrowly construed."  *Milner*, 131 S. Ct. at 1262 (citations omitted).

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citing *Bigwood v. U.S. Agency for Int'l Dev.*, 484 F. Supp. 2d 68, 73 (D.D.C. 2007)).  "The agency is entitled to summary judgment if no material facts are genuinely in dispute and the agency demonstrates that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information."  *Prop. of the People, Inc. v. Off. of Mgmt. & Budget*, 330 F. Supp. 3d 373, 380 (D.D.C. 2018) (citation omitted); *see also* Fed. R. Civ. P. 56(a).  When an agency invokes an exemption to disclosure, district courts must "determine *de novo* whether non-disclosure was permissible."  *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015).

The burden is on the agency to justify its response to the plaintiff's request.  5 U.S.C. § 552(a)(4)(B).  "An agency may sustain its burden by means of affidavits, but only if they contain

reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (citation omitted).  "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *Am. Civil Liberties Union v. Dep't of Defense*, 628 F.3d 612, 619 (D.C. Cir. 2011) (citations omitted).  "Uncontradicted, plausible affidavits showing reasonable specificity and a logical relation to the exemption are likely to prevail." *Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 509 (D.C. Cir. 2011) (citation omitted).  With these principles in mind, the Court turns to the merits of the parties' cross-motions for summary judgment.

## III.    DISCUSSION

The Court's analysis proceeds in three parts.  First, the Court will address the adequacy CBP's search in response to Plaintiff's FOIA request.  Next, the Court will consider the propriety of CBP's claimed FOIA exemptions. And finally, the Court will address Plaintiff's outstanding challenge regarding "segregability" and Plaintiff's request for limited discovery.

### A.  Adequacy of the Search

The Court begins by addressing the parties competing assertions regarding the adequacy of CBP's search in response to Plaintiff's January 29, 2017 FOIA request.  To do so, the Court will first describe the nature of CBP's search for responsive records.  Then, the Court will evaluate the adequacy of that search, taking into account Plaintiff's various objections.

### 1. CBP's Search

In this case, CBP's FOIA Appeals Officer Ms. Shari Suzuki oversaw the agency's search and document production in response to Plaintiff's FOIA request. Ms. Suzuki has been responsible for "overseeing all CBP activities related to information disclosure under FOIA" since 2006. Suzuki Decl., ECF No. 19-1, at ¶ 1. In October 2018, Ms. Suzuki provided an initial declaration, which "inform[ed] the Court . . . of CBP's actions since receiving Plaintiff's FOIA request" and "provide[d] an explanation of the procedures used in the search, review, and processing of the CBP records that were released to Plaintiff by CBP." *Id.* ¶ 4. Ms. Suzuki then supplemented her declaration in February 2019, providing further details regarding the scope and nature of CBP's document search. *See* Suppl. Suzuki Decl., ECF No. 25-3, at ¶¶ 6–20. The Court will rely on these declarations, as well as the record as a whole, when evaluating CBP's search for documents responsive to Plaintiff's six-part FOIA request.

### a. Part One

Part One of Plaintiff's FOIA request asked for "[d]ocuments referring to, relating to or mentioning the Women's March (or Women's Marches) scheduled to be held on January 21, 2017, that also mention or refer to persons entering or who might enter the United States from Canada." Suzuki Decl., ECF No. 19-1, Ex. A, at 1. To search for such documents, CBP's FOIA Appeals office "referred this portion of the request" to six offices within CBP: (1) the Office of Congressional Affairs, (2) the Office of Public Affairs, (3) the Intergovernmental Public Liaison Office, (4) the Office of the Commissioner, (5) the Policy Directorate, and (6) the Office of Field Operations." *Id.* ¶ 9. In her declaration, Ms. Suzuki explained why CBP identified each of these offices as appropriate places to search for responsive documents and detailed the search methods employed by each respective office. *See id.* ¶¶ 10–14. In total, CBP's searches through these

selected agency offices yielded 932 pages of records responsive to Part One of Plaintiff's FOIA request. *Id.* ¶ 7.

*First*, CBP conducted its search within the "Office of Congressional Affairs (OCA)" because this office "serves as the single point of contact within CBP for all communications between CBP and Congress." *Id.* ¶ 10.  In response to Part One of Plaintiff's FOIA requests, CBP employees within OCA searched the office's "correspondence tracking system for any correspondence relating to the Women's March." *Id.*  The OCA's "correspondence tracking system contains all official correspondence sent from and to Members of Congress," as well as the "correspondence sent to and from the Intergovernmental Public Liaison at CBP." *Id.*  OCA employees conducted their search using "the search terms 'womens march', 'women's march', 'women', 'woman', and 'inauguration.'" *Id.*  Their search yielded one responsive letter and envelope consisting of two pages. *Id.*

*Second*, CBP elected to search for responsive documents within the Office of Public Affairs (OPA), which "informs the American public through media outreach and public awareness campaigns conducted via media events, news, video and photography as well as the public website CBP.gov and informational brochures." *Id.* ¶ 11.  Within OPA, the Director of Media searched for responsive documents, given that "[a]ny emails, correspondence or policies related to media engagement regarding the Women's March would have been communicated through the Director of Media." *Id.*  Using the search terms "womens march" and "women's march," the Director of Media "searched his inbound, outbound, deleted and archived emails for any emails related to people found inadmissible for reasons related to the Women's March." *Id.*  "The Director also searched the OPA shared drive," which "contains records about all media issues and events handled by OPA at CBP headquarters" and was, therefore, "the most reasonable place to conduct

a search for responsive records." *Id.*  Lastly, the Director of Media also searched his own "personal computer files." *Id.*  CBP did not find any records within OPA responsive to Part One of Plaintiff's FOIA request. *See id.*

*Third*, CBP elected to search for responsive documents within the Intergovernmental Public Liaison Office (IPL), which is the CBP component "responsible for providing an effective bridge between local entities and the agency." *Id.* ¶ 12.  "The CBP Information Center, which houses the national customer service call center to address public questions and complaints, is located within IPL." *Id.*  Within the CBP Information Center, CBP officials "search[ed] . . . the Complaint Management System (CMS) which contains all complaints received by CBP via the website and phone calls," and this search covered the entire month of January 2017 and "all ports of entry." *Id.*  Moreover, CBP officials manually opened and reviewed "all complaints and incidents" identified for this time period "to determine if they were about the Women's March." *Id.*  "Lastly, since many of the complaints and comments referred to a newspaper article about a certain named individual, the name of that named individual was also queried as a search term to make sure that no complaints were missed." *Id.*  IPL's search retrieved "nine pages of responsive documents." *Id.*

*Fourth*, CBP carried out a search for documents responsive to Part One of Plaintiff's FOIA request within the Office of the Commissioner.  The Commissioner is "[t]he agency's chief executive [who] oversees 60,000 employees." *Id.* ¶ 13.  "Within the Office of the Commissioner, the Office of the Executive Secretariat (OES) is responsible for ensuring appropriate and expeditious action on all requests for information, executive correspondence and official memoranda addressed to the Commissioner and other CBP and DHS senior officials." *Id.*  "OES reviews, analyzes and tasks incoming correspondence from Congress, private sector, state and

local entities, foreign government officials and the public; creates correspondence records via a correspondence tracking database and keeps track of office records through this database; provides information and serves as the liaison between DHS and CBP on all correspondence matters tasked to CBP by DHS; and maintains and tracks correspondence of all CBP component-drafted materials for the Commissioner and Deputy Commissioner." *Id.* In response to Plaintiff's FOIA request, a "correspondence analyst" within OES "searched the correspondence tracking database, for any correspondence relating to the Women's March" using the search terms "womens march" and "women's march." *Id.* This search of the OES correspondence tracking database, which contains "all correspondence sent to and from the Commissioner" of CBP, yielded four responsive letters, totaling seven pages. *Id.*

*Fifth*, CBP elected to search for responsive documents within the agency's Policy Directorate. "The Policy Directorate serves as the designated lead in guiding CBP's overall policy development and implementation, and coordination with DHS and other governmental agencies, for matters that are of a significant, cross-cutting and/or agency-wide nature." *Id.* ¶ 14. In particular, CBP identified the Policy Directorate as a custodian in response to Plaintiff's FOIA request, because that office "handled all of the transition materials and meetings around the inauguration," and "[t]he office's shared drive would contain any records created or received by the Policy Directorate related to the Women's March." *Id.* Accordingly, the Acting Strategic Policy Advisor within CBP's Policy Directorate conducted "a search of the office's shared drive and emails for any records relating to the Women's March," using the search terms "womens march" and "women's march." *Id.* Furthermore, the Acting Strategic Policy Advisor "also directed the individuals in the office who handled issues relating to the inauguration to search their emails for any emails related to the Women's March," using those same search terms. *Id.* These

search efforts within the Policy Directorate produced no responsive records. *Id.*

*Sixth*, and finally, CBP carried out a search for documents responsive to Part One of Plaintiff's FOIA request within the Office of Field Operations (OFO), which is the "largest component" of the agency. *Id.* ¶ 15. There are 20 CBP Field Offices in the United States, established geographically by region. *Id.* Additionally, the OFO contains a Field Liaison "responsible for the oversight of the timely, accurate, comprehensive information and analysis and appropriate follow-up regarding significant incidents" that occur at the Field Offices. *Id.* In response to Plaintiff's FOIA request, CBP and its Field Liaison directed the Seattle, Boston, Detroit, Chicago, Buffalo, and Preclearance Offices to search for responsive records. *Id.* ¶ 16. "These Field Offices were identified as those that would have potentially processed the individuals being asked about in [Plaintiff's] request," in particular because these Field Offices covered the northern border with Canada. *Id.*

In total, the "majority" of CBP's responsive documents for Part One of Plaintiff's FOIA request came from the searches conducted by CBP's Field Offices. *Id.* "The **Chicago Field Office** conducted a manual search in the applicable CBP database to pull up all adverse action cases by the Area Ports within the Chicago Field Office during the specified time frame," resulting in the identification of "63 adverse action cases." *Id.* CBP officials in the Chicago Field Office then reviewed "each case . . . to determine if" the potential entrant's flight had originated in Canada. *Id.* "After reviewing the cases, the Chicago Field Office concluded that the Area Ports under the [Chicago Field Office] did not deem any individuals seeking entry to the U.S. from Canada inadmissible," and, therefore, identified "no responsive records." *Id.* Next, the **Detroit Field Office** "searched the two systems most likely to have responsive records . . . for refusals that occurred January 19th through 21st, 2017, at the ports of entry within its area of responsibility."

11

*Id.*  Field Office personnel in the Detroit Office also "searched emails in Microsoft Outlook to locate additional correspondence related to Washington, D.C.," and "the ports were asked to search all systems . . . as well as Outlook" for responsive records.  *Id.*  Altogether, the Detroit Field Office identified one refusal of admission at the border that "had a reference to Washington, D.C." and "four pages of emails" responsive to Part One of Plaintiff's FOIA request.  *Id.*  CPB also conducted a record search through the **Boston Field Office**, which "directed the ports located within its area of responsibility to search the two systems most likely to have responsive information for adverse actions that occurred January 19th through 21st, 2017, that pertained to the Women's March."  *Id.* The Boston Field Office also conducted searches of its email regarding the Women's March.  *Id.* The Boston Field Office did not identify any responsive documents.  *Id.*

Furthermore, the **Seattle Field Office** "conducted an email search in Microsoft Outlook" using the search terms "women's march," "womens march," "women march," "women's," "womens," and "march."  *Id.*  The Seattle Office also "searched the system likely to have responsive records for adverse actions from January 19th through 21st, 2017, related to the Women's March," yet the Seattle Office did not identify any "responsive records."  *Id.*  CBP also directed record searches through its **Buffalo Field Office**, which "searched the two systems likely to have responsive records for withdrawals and refusals that occurred at the ports of entry within its area of responsibility from January 19th through 21st, 2017."  *Id.*  Moreover, "[a]ll managers at the Buffalo Field Office and the ports of entry within the Buffalo Field Office were directed to search all email traffic and other records during the time period January 19th through 21st, 2017 for any records related to refusals/withdrawals, the presidential inauguration, and the Women's March and intelligence products relating to potential threats against the presidential inauguration or related events."  *Id.*  CBP officials at the Buffalo Office "also performed an internet search for

12

media coverage related to the presidential inauguration and associated Women's March."  *Id.*
Through these searches, the Buffalo Field Office identified "612 pages of emails and attachments"
responsive to Part One of Plaintiff's FOIA request.  *Id.*  Finally, CBP also directed searches
through its **Preclearance Field Office**.  "The Preclearance Field Office searched the two systems
from which Plaintiff was provided records, which were not responsive" to Part One of Plaintiff's
FOIA request.  *Id.*

### b.  Part Two

Part Two of Plaintiff's FOIA request asked for "[d]ocuments mentioning, referring to or
otherwise relating to any person or persons denied entry to the United States from Canada on
January 19, January 20 or January 21, 2017, including the reason or reasons such persons were
denied entry to the United States."  *Id.*, Ex. A, at 1.  CBP conducted its search for documents under
Part Two of Plaintiff's FOIA request in three principal stages.

*First*, in response to Part Two of Plaintiff's FOIA request, CBP directed the Policy,
Programs, Analysis, and Evaluation Office (PPAE) within the Office of Field Operations to
compile "a report listing every individual who was found to be inadmissible on the northern border
land ports of entry and at the Canada Preclearance airports on the days in question—January 19,
20, and 21, 2017."  *Id.* ¶ 18.  To generate this report, PPAE used "the Enterprise Management
Information System-Enterprise Data Warehouse (EMIS-EDW), which consolidates data from
various systems within CBP for analysis and reporting."  *Id.*  The EMIS-EDW database "is used
by CBP Officers to record passengers processed during inspection for adverse actions."  *Id.*
Utilizing this data, PPAE created a spreadsheet with "over 230 line entries that listed the calendar
date, the field office name, the port name, the ground of inadmissibility, and the charge description
of persons seeking entry from Canada who were deemed inadmissible during the time period in

question." *Id.*  CBP produced this spreadsheet to Plaintiff in response to Part Two of his FOIA request.  *Id.*

*Second*, in addition to the spreadsheet produced by PPAE, CBP's FOIA Appeals Office also asked CBP's Office of Information Technology "to conduct a search of information for individuals who were found inadmissible at northern border land ports of entry or Canada Preclearance airports on January 19, 20, or 21, 2017 and had 'Women's March' in the narrative associated with the incidents." *Id.* ¶ 19.  Accordingly, a program manager at the Office of Information Technology "queried EMIS-EDW for all individuals who were not admitted at northern land border ports of entry and Canada Preclearance airports from January 19, 20 & 21, 2017." *Id.*  This search utilized a number of search terms, including "women march," "Women March," "WOMEN MARCH," "women's march," "Women's March," "women's march," or "WOMEN's MARCH." *Id.*  "The query resulted in the names of 11 individuals," and CBP's FOIA Appeals Office "then asked the Office of Field Operations, Admissibility and Passenger Programs, to pull the records associated with these individuals from relevant databases." *Id.*  In total, this search yielded 186 pages responsive to Part Two of Plaintiff's FOIA request. *Id.*

*Third*, and finally, CBP later went back and collaborated with Plaintiff in 2018 to more effectively tailor the agency's original 230-line spreadsheet to search for targeted documents responsive to Part Two of Plaintiff's FOIA request. *Id.* ¶ 20.  Specifically, Plaintiff (1) limited the relevant time period on January 21, 2017 to any time until 3:00 PM, (2) requested that CBP exclude individuals "found inadmissible on multiple grounds and [where] one of those grounds was related to a crime," and (3) requested that CBP focus its search on "highlighted entries" in the spreadsheet, along with "all individuals within the jurisdiction of the Buffalo Field Office." *Id.*  Plaintiff also requested the exclusion of records lacking any reference to an individual participation in the

Women's March.  *Id.*  CBP's Office of Chief Counsel and CBP's FOIA Appeals Office then went through the spreadsheet and narrowed the scope of individuals referenced therein, in accordance with Plaintiff's requests.  *Id.* ¶ 21.  Thereafter, CBP's FOIA Appeals Office "asked the Office of Field Operations, Admissibility and Passenger Programs, to pull the records associated with these individuals from relevant databases."  *Id.* ¶ 22.  CBP's FOIA Appeals Office then "manually went through each document to determine whether there was any indication in the records that the person had expressed an interest in participating [in the] Women's March," and "[i]n an effort to be as inclusive as possible, records were included that did not mention the 'Women's March' but could be interpreted as related to those events."  *Id.*  In total, CBP reviewed 1228 pages of potentially responsive material and, within this set, identified and produced 76 pages responsive to Part Two of Plaintiff's FOIA request.  *Id.*

### c.  Parts Three and Four

Part Three of Plaintiff's FOIA request asked for "[d]ocuments consisting of, referring to or relating to orders, directives, guidance or suggestions of any nature that persons attempting to enter the United States from Canada on January 19, January 20 or January 21, 2017 should be barred from entry if such persons might be entering the United States to participate in the Women's March."  *Id.*, Ex. A, at 2.  In response, CBP's "Office of Field Operations, Field Liaison Division asked" the Seattle, Boston, Detroit, Chicago, Buffalo, and Preclearance Field Offices to conduct a search for responsive records.  *Id.* ¶ 23.  According to the declaration of Ms. Suzuki, these Field Offices conducted their search for records responsive to Part Three of Plaintiff's FOIA request by using the same search methods and search terms employed in searching for records responsive to Part One.  *Id.*; *see also* disc. *supra* at § III.A.1.a (discussing search for records responsive to Part One of Plaintiff's FOIA request).  CBP did not locate any responsive records for Part Three of

Plaintiff's FOIA request.  *See* Suzuki Decl., ECF No. 19-1, at ¶ 23.

Part Four of Plaintiff's FOIA request asked for "[d]ocuments consisting of, referring to or relating to communications (verbal or in writing) from any person or persons alleging that they were denied entry into the United States from Canada on January 19, January 20 or January 21, 2017." *Id.*, Ex. A, at 2.  In response to this request, CBP searched "the Complaint Management System (CMS) which contains all complaints received by CBP via the website and phone calls." *Id.* ¶ 24.  In this search, CBP identified "comments . . . received about persons denied entry into the United States," but found no comments "from a person *alleging* that they were denied entry." *Id.* (emphasis added).   In addition to complaints in CMS, CBP identified "the Department of Homeland Security Traveler Redress Inquiry Program (DHS TRIP) . . . as another possible source of potentially responsive information." *Id.*  CBP requested that the DHS TRIP Branch Chief search for documents responsive to Part Four of Plaintiff's FOIA request. *Id.*  The Branch Chief reported, however, that the redress management system within DHS TRIP was not searchable by time period, specified location, or key word. *Id.*  "Accordingly, no responsive records were located in connection with Part Four of the request." *Id.*

### d.  Parts Five and Six

Part Five of Plaintiff's FOIA request asked for "[d]ocuments consisting of a report, memorandum or communication from any official, officer, employee or contractor of the CBP regarding persons denied entry to the United States from Canada on January 19, January 20 or January 21, 2017." *Id.*, Ex. A, at 2.  CBP treated this request similarly to Part One of Plaintiff's FOIA request.  *See id.* ¶ 25.  Like with Part One, CBP instructed "various ports within the Office of Field Operations [to] provide[] emails and other policy documents responsive to this request." *Id.*  CBP selected the same Field Offices along the northern border for its search, as it did in

16

response to Part One of Plaintiff's FOIA request.  *See* disc. *supra* at § III.A.1.a (describing searches conducted by individual CBP Field Offices).  Moreover, the Office of Congressional Affairs searched Microsoft Outlook "for all emails (internal and to Congressional staff) related to the request for information from Senate and House Appropriations Committee staff on news reports of individuals being stopped at the Canadian border."  Suzuki Decl., ECF No. 19-1, at ¶ 25.  As a result of these search efforts, CBP retrieved and produced 653 pages of record responsive to Part Five of Plaintiff's FOIA request, *see id.* ¶ 7, which included "social media posts from CBP's Twitter" account, *id.* ¶ 25.

Lastly, Part Six of Plaintiff's FOIA request asked for "[d]ocuments consisting of, including or mentioning any communications (verbal or in writing) from officials or employees of any branch, division, agency or other body of the government of Canada, or any Province or municipality thereof, regarding allegations that persons were denied entry to the United States from Canada on January 19, January 20 or January 21, 2017."  *Id.*, Ex. A, at 2.  To search for documents responsive to Part Six, CBP referred Plaintiff's request to the Office of International Affairs as a custodian.  *See id.* ¶ 26.  CBP made this referral because the Office of International Affairs "provides unified coordination of CBP's international activities" and "supports all of CBP's foreign initiatives, policies, programs, and activities."  *Id.*  Because the Office of International Affairs does not have a "correspondence tracking database," the Assistant Attaché for Canada conducted the search by searching the Office's Microsoft Outlook email system, using the search terms "woman," "women," "women's," "woman's," and "march."  *Id.*  CBP identified "no records responsive to [Plaintiff's] request for communications from officials or employees from the government of Canada."  *Id.*

### 2. CBP's Search Was Adequate

Having described in detail the scope and methodology of CBP's search, the Court will now assess its adequacy in response to Plaintiff's FOIA request.  The Court will then address each of Plaintiff's related objections to CBP's search.

### a. CBP's Search Was Reasonably Calculated To Produce Responsive Documents

"An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (internal quotation omitted).  "The agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Id.* at 326 (internal quotation and alterations omitted).  "The agency cannot limit its search to only one or more places if there are additional sources that are likely to turn up the information requested." *Id.* (internal quotations omitted).  "In a suit seeking agency documents . . . at the summary judgment stage, where the agency has the burden to show that it acted in accordance with the statute, the court may rely on a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1003 (D.C. Cir. 2009) (internal quotations omitted).

CBP's search for records responsive to Plaintiff's FOIA request was adequate, with one narrow exception noted herein.  As described at length above, the detailed declaration provided by CBP's Chief of FOIA Appeals demonstrates the agency's fulsome response to each of Plaintiff's six categories of requests.  *See* Suzuki Decl., ECF No. 19-1, at ¶¶ 6–20.  In response to those requests, CBP conducted multiple searches of its relevant electronic databases, which collect and

store the agency's information related to individuals deemed inadmissible at the border.  *See id.*
¶¶ 16, 18, 42.  CBP has explained the scope and contents of the databases searched, and may rely
on such "authoritative" agency databases as part of a reasonable search for responsive records.
*Long v. ICE*, 149 F. Supp. 3d 39, 60 (D.D.C. 2015).

Furthermore, CBP's database searches were both iterative and collaborative.  For example,
to provide Plaintiff with complete, yet target-specific data, CBP generated a spreadsheet from its
EMIS-EDW database "that listed the calendar date, the field office name, the port name, the ground
of inadmissibility, and the charge description of persons seeking entry from Canada who were
deemed inadmissible during the time period in question."  Suzuki Decl., ECF No. 19-1, at ¶ 18.
CBP officials then worked with Plaintiff to refine the scope of those spreadsheet entries and
conduct subsequent record searches based upon a narrowed subset of entries meeting Plaintiff's
designated parameters.  *See id.* ¶¶ 20–22.  In addition, CBP officials also conducted manual
document reviews where appropriate, *see, e.g.*, *id.* ¶¶ 16, 22, and employed targeted email searches
within specific agency offices, *see, e.g.*, *id.* ¶¶ 16, 25.  CBP has also specified its use of reasonable
search terms to the Court.  *See, e.g.*, *id.* ¶¶ 14, 19.

Finally, the "reasonableness" of CBP's FOIA search "is necessarily 'dependent upon the
circumstances of the case.'"  *Swick v. United States Dep't of the Army*, 471 F. Supp. 3d 246, 251
(D.D.C. 2020) (quoting *Davis v. Dep't of Justice*, 460 F.3d 92, 103 (D.C. Cir. 2006)).  And here,
the "circumstances of the case" include the realities of coordinating a document search across a
large executive agency like CBP, which includes 60,000 employees over numerous offices and
regions.  Suzuki Decl., ECF No. 19-1, ¶ 13.  Accounting for this disparate reach, CBP's search
methodology in this case broadly employed the assistance of various agency components.  In her
declaration, Ms. Suzuki plausibly explains why CBP selected these components as likely sources

of responsive records, based on both their *geographic* relevance, *see id.* ¶ 16 (describing selection of Field Offices along the northern border), and *subject-matter* relevance, *see id.* ¶¶ 9, 26, to Plaintiff's six-part FOIA request. This comprehensive, agency-wide approach further demonstrates the overall "reasonableness" of CBP's FOIA search in this case.

Altogether, CBP's multi-faceted response to Plaintiff's FOIA request reflects the agency's "good faith effort to conduct a search for the requested records, using methods which [could] be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990); *see also Barnard v. Dep't of Homeland Sec.*, 598 F. Supp. 2d 1, 10 (D.D.C. 2009) (finding agency search adequate where supporting declarations described the searches performed, the databases and ports of entry implicated, and the search terms employed).

### b. Plaintiff's Objections To CBP's Search Are Unpersuasive

Plaintiff has asserted a wide array of overlapping objections to the adequacy of CBP's FOIA search. *See* Pl.'s Cross-Mot. at 7–19. Broadly speaking, Plaintiff first urges the Court to draw certain unfavorable inferences against CBP and its search for responsive records. *See id.* at 8–10. Then, Plaintiff presents a long list of individualized objections to the methodology of CBP's records search. *See id.* at 11–19. Below, the Court has endeavored to organize Plaintiff's disparate objections and then explain why these objections are ultimately insufficient to rebut the reasonableness of CBP's FOIA search, save for one narrow exception.

*First*, Plaintiff asks the Court to draw a variety of adverse "inferences," which pertain to CPB's alleged misconduct surrounding the January 2017 Women's March. Specifically, Plaintiff asks the Court to infer that: (1) CBP "denied entry to the United States to both residents of Canada and U.S. citizens accompanying them whose espoused purpose was to come into this country in order to participate in Women's March events held, *inter alia*, in Washington, D.C.," (2) "[s]ome

of the denials of entry surrounding Women's March events appear to have been unwarranted, improper and unlawful," (3) CBP's "potentially unlawful and otherwise improper denials of entry by CBP . . . may have, *inter alia*, violated Plaintiff's First Amendment rights and the rights of Canadian residents," (4) CBP's records "may disclose that CBP misled Members of Congress and the press regarding the facts and circumstances surrounding certain denials of entry in relation to persons wishing to enter the United States to participate in Women's March events," and (5) many CBP employees "expressed support for Donald J. Trump in his bid to become President of the United States" and "therefore had politically motivated reasons" to reduce attendance at the Women's March. *Id.* at 8–9.

These proposed "inferences" miss the mark. To begin, the parties are not litigating the lawfulness of CBP's underlying conduct surrounding border admissions and the Women's March. Rather, the Court is now considering the adequacy of CBP's FOIA search, a question that turns on whether the agency's search "was reasonably calculated to uncover all relevant documents." *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999). The five aforementioned "inferences," however, do not speak to a defect in CBP's search methodology, but rather make assertions about CBP's supposed misconduct surrounding the Women's March. And to the extent Plaintiff hopes these inferences will raise a specter of "bad faith," the Court finds that Plaintiff's speculation about CBP's hypothetical misconduct regarding the Women's March is insufficiently specific to serve as "evidence that the agency's *search*" for records about such misconduct under FOIA "was not made in good faith." *Kowal v. United States Dep't of Just.*, 464 F. Supp. 3d 376, 382 (D.D.C. 2020) (emphasis added).

*Second*, Plaintiff argues that the Court should draw inferences against CBP because it originally "denied that it had records responsive to Plaintiff's Request . . . and then fail[ed] to

timely act on Plaintiff's agency appeals, despite repeated efforts by Plaintiff to elicit the cooperation of CBP in that regard."  Pl.'s Cross-Mot. at 8–9.  The Court finds this assertion unavailing, as well.  The fact that CBP supplemented its initial search and subsequently retrieved additional responsive documents, does not necessarily evince bad faith on behalf of the agency.  "[A]n inquiry regarding the adequacy of an agency's search requires a court to focus on the actual search or searches, not on the results of the same."  *Barnard*, 598 F. Supp. 2d at 10 (citing *Weisberg v. Dep't of Justice*, 705 F.2d 1344, 1351–52 (D.C. Cir. 1983)).  And "courts routinely uphold the sufficiency of an[] agency's search even when additional records are located after multiple searches."  *Id.*  As such, the Court declines to find bad faith or draw inferences against CBP here, based upon the agency's initial inability to locate responsive documents, which it later identified and produced to Plaintiff.

*Third*, Plaintiff presents multiple objections related to CBP's decision not to conduct personalized follow-up searches with the specific CBP agents who interacted with Canadians crossing the northern border between January 19 through January 21, 2017.  *See* Pl.'s Cross-Mot. at 11–17 (¶¶ a, b, & i); *see also* Pl.'s Stmt. of Facts, ECF No. 20-2, at ¶¶ 62–63, 96.  In particular, Plaintiff contends that CBP should have "made inquiries to individual border agents or other CBP employees involved in denials of entry," Pl.'s Cross-Mot. at 12 (¶ a), and then searched their personal devices, including their email, social media, and messaging history, *see id.* at 12 (¶ b).  According to Plaintiff, such a search "would not have overly burdensome," given the relatively small subset of CBP agents involved.  *Id.* at 17 (¶ i).

Excluding a narrow exception addressed below, *see* disc. *infra* at 27–28, the Court is not persuaded by this category of objections.  CBP has plausibly explained why the agent-specific "follow-up" searches Plaintiff proposes were not reasonably likely to produce responsive

documents.  First, "it is not the agency's practice to maintain individual or personal records related to inadmissibility determinations in individual files of employees."  Suzuki Suppl. Decl., ECF No. 25-3, at ¶ 14.  Moreover, because CBP's records of inadmissibility "are completed electronically and stored in centralized databases . . . it is not reasonably likely that any individual CBP employee would maintain his or her own records regarding an inadmissibility determination for a particular traveler, nor is it the practice of CBP for individual employees to take individual notes not reflected in the centrally maintained records."  *Id.*

And with regards to the collection of personal messages and social media posts, CBP has explained that "any emails sent over [government-issued and personal communication devices] would be captured in the Outlook mailbox of th[at] individual" and would, therefore, be subject to the email searches carried out by the agency.  *Id.* ¶ 16.  Furthermore, it is not the agency's "practice for employees to send work-related communications on personal (as opposed to government-issued) mobile communication devices, or through personal texting and personal social media."  *Id.* ¶ 17.  Finally, as CBP notes, executive agency employees "may not create or send a record using a non-official electronic messaging account" unless the employee either copies an official account on the correspondence or subsequently forwards the message to an official agency account.  44 U.S.C. § 2911(a).  For these reasons, the Court is unpersuaded by Plaintiff's objection that CBP should have generally conducted follow-up searches with specific border agents and their personal communications.

*Fourth*, Plaintiff objects to the adequacy of CBP's selected search terms.  *See* Pl.'s Cross-Mot. at 17–18 (¶¶ j & k); *see also* Pl.'s Stmt. of Facts, ECF No. 20-2, at ¶¶ 40–42, 50–51.  These objections also come up short.  "Agencies generally have discretion in crafting a list of search terms as long as they are reasonably tailored to uncover documents responsive to the FOIA

request." *Tushnet v. ICE*, 246 F. Supp. 3d 422, 434 (D.D.C. 2017) (quotation omitted). "Where the agency's search terms are reasonable, the Court will not second guess the agency regarding whether other search terms might have been superior." *Liberation Newspaper v. Dep't of State*, 80 F. Supp. 3d 137, 146 (D.D.C. 2015). Here, Plaintiff first criticizes CBP for omitting some of Plaintiff's proposed search terms from its FOIA searches. *See* Pl.'s Cross-Mot. at 17. But "[i]n general, a FOIA petitioner cannot dictate the search terms for his or her FOIA request." *Bigwood v. United States Dep't of Def.*, 132 F. Supp. 3d 124, 140 (D.D.C. 2015). Moreover, the Court finds that the search terms employed by CBP in this case—specifically enumerated in Ms. Suzuki's supporting declaration—are reasonable, *see* Suzuki Decl., ECF No. 19-1, at ¶¶ 10–19 (setting forth agency search terms), and the Court, therefore, refuses to "second guess the agency regarding whether other search terms might have been superior," *Liberation Newspaper*, 80 F. Supp. 3d at 146. Furthermore, Ms. Suzuki's supplemental declaration plausibly explains why CBP did not adopt certain of Plaintiff's proposed search terms. *See* Suzuki Suppl. Decl., ECF No. 25-3, at ¶¶ 10–12. Finally, while Plaintiff complains that the Buffalo Field Office failed to disclose the search terms used in its searches, *see* Pl.'s Cross-Mot. at 18, the agency reasonably explains that the Buffalo Office conducted a "manual review," rather than an automated email search, Suzuki Suppl. Decl., ECF No. 25-3, at ¶ 13. For these reasons, the Court is unpersuaded by Plaintiff's objections to CBP's search terms.

*Fifth*, Plaintiff raises objections to the end-results of CBP's FOIA search and production. Specifically, Plaintiff argues for the inadequacy of CBP's FOIA search, by pointing to the agency's failure to produce (1) "videos or sound recordings, or transcripts thereof," documenting interactions between CBP officials and potential border entrants and (2) "other records of verbal communications by or with persons denied entry." Pl.'s Cross-Mot. at 15–16 (¶¶ f–g); *see also*

Pl.'s Stmt. of Facts, ECF No. 20-2, at ¶¶ 70–73.  To begin, this argument contravenes the principle that the adequacy of a FOIA search "is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search."  *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003); *see also Media Research Center v. U.S. Dep't of Justice*, 818 F. Supp. 2d 131, 138 (D.D.C. 2011) ("An agency's search is not presumed unreasonable because it fails to find every potentially responsive document.").  As such, Plaintiff cannot prove CBP's FOIA search inadequate simply by identifying certain types of omitted documents he expected his FOIA request to yield, like "video recordings" or "other records of verbal communications."  Pl.'s Cross-Mot. at 15–16 (¶¶ f–g).  Furthermore, CBP has explained that "[v]ideo and sound recordings are not the normal way of processing travelers," Suzuki Decl., ECF No. 19-1, at ¶ 27, and the agency "does not generally retain video of the inspection of arriving travelers," Suzuki Suppl. Decl., ECF No. 25-3, at ¶ 18.  For these reasons, the Court is unpersuaded by Plaintiff's objections to the results of CBP's search.

*Sixth*, Plaintiff objects to CBP's statement that Parts Three, Four, Five, and Six of Plaintiff's FOIA requests are "somewhat duplicative" and that, in responding to those requests, the agency "relied where appropriate on its search for the first and second part[s]" of Plaintiff's FOIA request.  *See* Pl.'s Cross-Mot. at 16 (¶ h); *see also* Pl.'s Stmt. of Facts, ECF No. 20-2, at ¶ 38.  From this, Plaintiff extrapolates that CBP "may not have thoroughly searched for documents responsive to [Parts] 3, 4, 5, and 6."  Pl.'s Cross-Mot. at 16 (¶ h).  This objection clearly falls short and does not merit much discussion.  First, the Court agrees that the various components of Plaintiff's FOIA request do overlap to a certain extent.  *See* Suzuki Decl., ECF No. 19-1, Ex. A, at 1–2.  And regardless, CBP's attempt to rely "where appropriate" on material retrieved from earlier searches when responding to other parts of Plaintiff's request does not itself render CBP's

search inadequate.  To the contrary, the agency has delineated its comprehensive approach to each

aspect of Plaintiff's six-part FOIA request.  *See* disc. *supra* at § III.A.1.

*Seventh*, Plaintiff raises a variety of miscellaneous objections to the location and

methodology of CBP's search for responsive records.  The Court finds each of these objections to

be unavailing, but for the sake of comprehensiveness, the Court will address each objection below:

- **Search History**: Plaintiff contends that CBP's search was inadequate because it did not review the search history on the browsers of its agents' computers and personal devices.  *See* Pl.'s Cross-Mot. at 13 (¶ c); Pl.'s Stmt. of Fact, ECF No. 20-2, at ¶ 95.  CBP, however, reasonably explained that relevant documentation produced by border agents regarding the admissibility of travelers at the border would have been collected on centralized databases, already searched by the agency.  *See* Suzuki Suppl. Decl., ECF No. 25-3, at ¶ 14.

- **Personnel Files**:  Plaintiff argues that CBP should have searched for "complaints" and related information by reviewing "the personnel files of that subset of border agents and other CBP employees involved in denying entry to Canadian residents on the dates, and relevant to the grounds, specified in his [FOIA] request."  Pl.'s Cross-Mot. at 14 (¶ e).  CBP, however, reasonably explained that it has already "conducted its search for complaints in the location in which all complaints were reasonably likely to be found," the agency's centralized Complaint Management System (CMS).  Suzuki Suppl. Decl., ECF No. 25-3, at ¶ 9.  Moreover, CBP explains that an "individual employee's official personnel file is not a location likely to contain information regarding any complaints that might have been made against a CBP employee by a member of the public."  *Id.*

- **Search for Complaints**: Plaintiff asserts that CBP should have searched for relevant "complaints" outside of "the confines of its Complaint Management System (CMS)."  Pl.'s Cross-Mot. at 18 (¶ l); *see also* Pl.'s Stmt. of Facts, ¶¶ 45–46.  Moreover, Plaintiff complains that CBP's search for complaints within the CMS database was too narrow.  *See* Pl.'s Cross-Mot. at 18 (¶ l).  The Court disagrees.  First, CBP has persuasively explained that CMS is the agency's centralized complaint database, containing all complaints received via CBP's website, by phone, or in person.  *See* Suzuki Suppl. Decl., ECF No. 25-3, at ¶ 8.  Moreover, CBP officials conducted a manual review of all complaints and incidents recorded for January 2017 within the CMS database, to determine whether any pertained to the Women's March.  *See* Suzuki Decl., ECF No. 19-1, at ¶¶ 12, 24.  This approach was reasonable and adequate.

- **DHS TRIP Search**:  Plaintiff complains that CBP "failed to conduct a manual search after its automated search of the Department of Homeland Security

Traveler Redress Inquiry Program (DHS TRIP) failed to produce relevant records." Pl.'s Cross-Mot. at 19 (¶ m).  In particular, Plaintiff contends that within the DHS TRIP system, CBP should have conducted email searches and manual reviews of "physical files."  *Id.*; *see also* Pl.'s Stmt. of Fact, ECF No. 20-2, at ¶¶ 57–60, 67.  But in response, CBP reasonably explained that the redress management system within DHS TRIP is not searchable "using key word, events, locations, or time periods."  Suzuki Suppl. Decl., ECF No 25-3, at ¶ 19.  Instead, CBP generally runs searches using a "person-centric" control number.  *Id.*  Moreover, the redress system within DHS TRIP contains a voluminous amount of documentations—approximately 13,000 files for 2017—that is not reasonably amenable to a manual search.  *Id.*

- **Office of International Affairs Search**:  Plaintiff objects to the fact that "CBP's search for records responsive to [Part Six of his FOIA request] did not include physical files of the Office of International Affairs, but instead relied solely upon an email search using Microsoft Office."  Pl.'s Cross-Mot. at 19 (¶ n); *see also* Pl.'s Stmt. of Facts, ECF No. 20-2, at ¶ 64.  CBP, however, has reasonably explained that the Office of Internal Affairs "does not have a correspondence tracking database."  Suzuki Suppl. Decl., ECF No. 25-3, at ¶ 20.  To conduct a search within the Office of International Affairs for documents responsive to Part Six of Plaintiff's request, CBP reasonably appointed the Assistant Attaché for Canada to lead the search, and that official "determined that the email system was the location reasonably likely to have any responsive records."  *Id.*

For the reasons set forth above, the Court does not find that any of Plaintiff's miscellaneous objections to search location and methodology undermine the overall adequacy and reasonableness of CBP's FOIA search.  *See* disc. *supra* at § III.A.2.a.

*Finally*, the Court separately addresses the objections Plaintiff raises regarding the declaration supplied by Mr. Joseph DeCunha.  *See* DeCunha Decl., ECF No. 20-3, at 5–9; Pl.'s Reply at 5–6.  Mr. DeCunha is a Canadian citizen who attempted to enter the United States on January 19, 2021 to participate in the Women's March.  *See* DeCunha Decl., ECF No. 20-3, at 5 (¶¶ 3–5).  In his declaration, submitted in support of Plaintiff's cross-motion, Mr. DeCunha states that when he attempted to enter the United States at the Champlain–St. Bernard Lacolle Border Crossing, a CBP official initially denied him entry "because of [his] desire to participate in the Women's March."  *Id.* at 6 (¶ 13).  Mr. DeCunha's affidavit specifically identifies the CBP official

as Officer "Brendon Quammie."  *Id.* at 6 (¶ 7).  As early as October 2017, Plaintiff requested that CBP question Officer Quammie and his colleagues at the Champlain–St. Bernard de Lacolle Border Crossing regarding the existence of any documents responsive to his FOIA request.  *See* Jt. Status Rep., ECF No. 8, at 10.

In his current summary judgment briefing, Plaintiff now points out that CBP "has not sought to refute any of the contentions in Mr. DeCunha's declaration" and has "also failed to indicate in its submissions to the Court whether its records regarding Mr. DeCunha's denial of entry have been provided to Plaintiff."  Pl.'s Reply at 6.  According to Plaintiff, "[f]ailure to provide that information brings into question whether CBP conducted an adequate good-faith search for relevant records, which surely would have disclosed Mr. DeCunha's denial of entry." *Id.*  The Court agrees with Plaintiff's overarching argument on this point.  In explaining the contours and adequacy of its search, CBP has not specifically addressed Mr. DeCunha's declaration, which is clearly relevant to Plaintiff's FOIA request.  *See* Suzuki Decl., ECF No. 19-1, Ex. A, at 1–2.  Neither has CBP clearly addressed whether any of its searches would have targeted Mr. DeCuhna, Officer Brendon Quammie, or the Champlain port of entry. *See* https://www.cbp.gov/contact/ports/champlain.  Plaintiff expressly raised this material to CBP as a potential source of records that would likely be responsive to Plaintiff's targeted FOIA requests.  Accordingly, the Court concludes that to complete its adequate search CBP should run targeted searches for records related to Mr. DeCunha, Officer Brendon Quammie, and the Champlain border crossing.  Alternatively, CBP should, at a minimum, explain if and how its earlier searches (*i.e.*, through the Buffalo Field Office) have already addressed these concerns, or why these specified searches are not otherwise feasible.

****

In sum, the Court finds that when considering the overall "circumstances of the case," *Davis v. Dep't of Justice*, 460 F.3d 92, 103 (D.C. Cir. 2006), CBP's FOIA search, with the minor exception addressed above, was adequate.  By in large, Plaintiff's myriad objections rest on speculation over potential alterations to CBP's search methodology, but "[t]here is no requirement that an agency search every record system" or overturn every proverbial stone.  *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).  Instead, an agency's search is ultimately "judged by whether it was 'reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant."  *Kowal v. United States Dep't of Just.*, 464 F. Supp. 3d 376, 382 (D.D.C. 2020) (citing *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991)).  And here, CBP has demonstrated that its FOIA search was comprehensive, multi-faceted, and iterative, in a manner that was "reasonably calculated" to retrieve documents responsive to Plaintiff's FOIA request.  *See* disc. *supra* at § III.A.2.a.  Consequently, the Court will **GRANT** summary judgment on this ground, in favor of CBP as to the adequacy of its FOIA search, except as to those narrow issues raised in the declaration of Mr. Joseph DeCunha, addressed above.

## B.  FOIA Exemptions

Next, the parties dispute the legitimacy of CBP's claimed FOIA exemptions.  Of the 937 pages of responsive records CBP has produced, the agency has applied redactions to 870 of those pages under four separate FOIA exemptions: Exemptions 5, 6, 7(C), and 7(E).  *See* Suzuki Decl., ECF No. 19-1, at ¶ 8.  Broadly speaking, these FOIA exemptions implicate the agency's deliberative decision-making process (Exemption 5), personal privacy right's (Exemptions 6 and 7(C)), and law enforcement functions (Exemption 7(E)).  *See* 5 U.S.C. § 552(b)(5)-(7).  Plaintiff objects to each of CBP's designated FOIA exemptions on multiple grounds.  *See* Pl.'s Cross-Mot.

at 20–26.

An agency bears the burden of demonstrating the applicability of the FOIA exemptions it claims. *Public Inv'rs Arbitration Bar Ass'n v. SEC*, 771 F.3d 1, 3 (D.C. Cir. 2014). "Typically, the agency demonstrates the applicability of a FOIA exemption by providing affidavits regarding the claimed exemptions." *Shapiro v. United States Dep't of Just.*, 893 F.3d 796, 799 (D.C. Cir. 2018). The agency may also submit "a detailed description of the information withheld through the submission of a so-called '*Vaughn* Index.'" *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 88 (D.D.C. 2009) (citing *Vaughn v. Rosen*, 484 F.2d 820, 826–27 (D.C. Cir. 1973)). "The *Vaughn* Index and/or accompanying affidavits or declarations must 'provide[ ] a relatively detailed justification, specifically identif[y] the reasons why a particular exemption is relevant, and correlat[e] those claims with the particular part of a withheld document to which they apply.'" *Id.* (quoting *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 146 (D.C. Cir. 2006)). "Withholding information under conclusory, generalized, or sweeping allegations of exemptions is not acceptable." *Elec. Priv. Info. Ctr. v. DEA*, 192 F. Supp. 3d 92, 103 (D.D.C. 2016).

At this time, CBP's support for its FOIA exemptions suffers from a threshold lack of specificity. With its summary judgment motion, CBP proffered a single declaration from the agency's FOIA Appeals Officer, Ms. Shari Suzuki, to support its FOIA exemptions. *See* Suzuki Decl, ECF No. 19-1, at ¶¶ 29–59. This declaration simultaneously serves as the agency's *Vaughn* Index. *See* Def.'s Mot. at 1 n.1. Within her declaration, Ms. Suzuki offers only broad explanations supporting the applicability of FOIA Exemptions 5, 6, 7(C), and 7(E) to generalized categories of documents. *See* Suzuki Decl., ECF No. 19-1, at ¶¶ 8, 29–59. CBP, however, has not provided the full set of redacted documents to the Court, and has provided no other way for the Court to specifically connect any of the agency's categorical justifications for a claimed FOIA exemption

to any specific document or redaction.  As such, the agency's "broad categorical descriptions" within the current record, do not allow the Court to "engag[e] in a meaningful review of the agency's decision" to withhold specific material under the agency's claimed FOIA exemptions. *Hall v. U.S. Dep't of Just.*, 552 F. Supp. 2d 23, 27 (D.D.C. 2008) (citing *Oglesby v. U.S. Dep't of Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996)); *see also Morley v. CIA*, 508 F.3d 1108, 1122 (D.C. Cir. 2007) ("[C]ategorical description of redacted material coupled with categorical indication of anticipated consequences of disclosure is clearly inadequate.") (quotation omitted).

By way of example, Ms. Suzuki's declaration explains that CBP has redacted law enforcement-related material under FOIA Exemption 7(E) from 555 pages of responsive records. Suzuki Decl., ECF No. 19-1, at ¶ 8.  Within this set of 555 pages, however, an unknown number of Exemption 7(E) redactions apply to a broad category of material, identified as "information revealed during the inspection by third-party individuals."  *Id.* ¶ 54.  Such an assertion presents two immediate impediments to the Court's FOIA review.  First, the categorical statement is vague on its face.  But moreover, it is also untethered from any particular document or redaction. Therefore, it is unclear from CBP's supporting affidavit how many documents this broad Exemption 7(E) justification applies to, let alone the specific documents that it covers.  Indeed, Ms. Suzuki's supporting affidavit does not clarify how many redactions are supported by any of the various categorical justifications asserted therein.  As such, the Court is left to speculate about the number of Exemption 7(E) withholdings based vaguely on items like "information revealed during the inspection by third-party individuals," *id.* ¶ 54, or, instead, based on a more specific grounds, such as "information about drug arrests and seizures for the week leading up to January 13, 2017," *id.* ¶ 52.

The same threshold problem applies to CBP's other claimed FOIA exemptions.  In total,

31

CBP has invoked Exemptions 6 and 7(C) to redact personally identifying information from 846 pages of responsive records.  *See id.* ¶ 8.  But within that large grouping, it is again unknown how many documents bear redactions because they contain, for example, "personally identifiable information," *id.* ¶ 45, or, instead, how many redactions apply to alternative categories of information, like "the reason for travel to the United States," or "other factors CBP considered in evaluating the individual's admissibility and remarks based on those factors," *id.* ¶ 48.  Similarly, CBP has applied FOIA Exemption 5 to redact deliberative agency material from 83 pages of responsive records.  *Id.* ¶ 8.  Yet, CBP only provides a categorical explanation for these redactions as well, stating, for example, that some redactions apply to "draft responses to questions from Congress," *id.* ¶ 31, while others apply to "deliberation for using certain photos for a public statement and the reason behind them," *id.* ¶ 33.

In short, CBP's categorical justifications for its FOIA withholdings fail to facilitate a "meaningful review" of its claimed FOIA exemptions.  *Hall*, 552 F. Supp. 2d at 27.  Because CBP provides only broad categorical explanations for its claimed FOIA exemptions, the Court is unable to clearly discern which of the agency's justifications apply to any of the various redactions made.  This approach is contrary to the agency's obligation to "'provide[] a relatively detailed justification, specifically identif[y] the reasons why a particular exemption is relevant, and correlat[e] those claims with the particular part of a withheld document to which they apply.'" *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 88 (D.D.C. 2009) (quoting *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 146 (D.C. Cir. 2006)); *see also Kowal v. United States Dep't of Just.*, 464 F. Supp. 3d 376, 384 (D.D.C. 2020) (rejecting *Vaughn* indices that "claim[ed] exemptions for each document, but . . . d[id] not adequately correlate those claims with the particular part of a withheld document to which they apply.").

This threshold shortcoming prevents the Court from addressing the full scope of Plaintiff's objections to CBP's claimed FOIA exemptions.  Accordingly, the Court will **DENY WITHOUT PREJUDICE** the parties' respective cross-motions regarding CBP's claimed FOIA exemptions at this time.  *See* Def.'s Mot. at 7–16; Pl.'s Cross-Mot. at 20–26.  The Court will **ORDER** CBP to supplement the record with a more particularized *Vaughn* Index, separate and distinct from any supporting agency affidavits.  After the submission of this revised *Vaughn* Index, the Court will permit the parties to file revised briefing addressing the validity of CBP's claimed FOIA exemptions.

**C.  Segregability And Request For Limited Discovery**

The parties present two remaining issues for the Court to address.  First, Plaintiff challenges CBP's efforts to disclose all reasonably segregable portions of its responsive records, and further proposes that the Court should engage in a limited *in camera* review to ensure that the agency has satisfied its segregability obligations.  *See* Pl.'s Cross-Mot. at 27–28; *see also Machado Amadis v. United States Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020) (discussing segregability requirement).  In response, CBP rests on the "presumption" that it has complied with its obligation to disclose all reasonably segregable materials to Plaintiff and points to the absence of any evidence to the contrary.  Def.'s Reply at 20 (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007)).  Because the Court will order CBP to first supplement its *Vaughn* Index to clarify its claimed FOIA exemptions, the Court finds that it would be premature to render a final determination on segregability at this time.  *See* disc. *supra* at § III.B.  Accordingly, the Court will **DENY WITHOUT PREJUDICE** the parties' respective cross-motions on the issue of segregability.  The parties may address the issue of segregability in their subsequent summary judgment briefing, submitted after CBP provides its revised *Vaughn* Index.

Second, Plaintiff asks the Court to "reserve his ability to later request that the Court grant Plaintiff reasonable and limited discovery to ensure that CBP has fulfilled its FOIA obligations." Pl.'s Cross-Mot. at 28.  The Court has "broad discretion to manage the scope of discovery" in FOIA cases.  *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991).  As a general matter, "[d]iscovery in FOIA is rare and should be denied where an agency's declarations are reasonably detailed, submitted in good faith and the court is satisfied that no factual dispute remains."  *Landmark Legal Found. v. EPA*, 959 F. Supp. 2d 175, 183 (D.D.C. 2013) (quotation omitted).  Here, Plaintiff's request to "reserve his ability" to seek discovery stands on uncertain ground.  Nonetheless, disputes in this case remain regarding CBP's FOIA exemptions, which the agency will address in its revised *Vaughn* Index.  Considering the pendency of these issues, the Court, at this juncture, will **DENY WITHOUT PREJUDICE** both parties' respective cross-motions regarding Plaintiff's request for limited discovery.  Again, the parties may address the issue of discovery in their subsequent summary judgment briefing, submitted after CBP provides its revised *Vaughn* Index.

## IV.   CONCLUSION

For the reasons set forth in this Memorandum Opinion, the Court will **GRANT IN PART** and **DENY IN PART** CBP's Motion for Summary Judgment, and will **GRANT IN PART** and **DENY IN PART** Plaintiff's Cross-Motion for Summary Judgment.  Specifically, the Court will order as follows:

The Court will **GRANT** summary judgment in favor of CBP with regards to the adequacy of CBP's FOIA search, with one exception.  To complete its adequate FOIA search, CBP shall run searches targeting the issues raised in the declaration of Mr. Joseph DeCunha.  *See* DeCunha Decl., ECF No. 20-3, at 5–9.  Alternatively, CBP should explain if and how its earlier searches have

already addressed these issues, or why these specified searches are not otherwise feasible.

Next, the Court will **DENY WITHOUT PREJUDICE** both parties' respective motions with regards to CBP's claimed FOIA exemptions.  By or before **JUNE 14, 2021**, CBP shall file a revised *Vaughn* Index supporting its claimed FOIA exemptions with greater particularity.  This revised *Vaughn* Index shall be separate and distinct from any supporting affidavits.

Finally, the Court will **DENY WITHOUT PREJUDICE** the parties' respective motions with regards to "segregability" and Plaintiff's request for discovery.  Given the outstanding disputes regarding CBP's claimed FOIA exemptions, the Court concludes that it would be premature to rule on these issues, at this juncture.

Following the submission of CBP's revised *Vaughn* Index by or before **JUNE 14, 2021**, the Court will set a new briefing schedule, permitting the parties to file renewed cross-motions addressing the remaining issues in this case.

An appropriate order accompanies this Memorandum Opinion.

**Date:** May 14, 2021                          _____/s/_____

                                          COLLEEN KOLLAR-KOTELLY
                                          United States District Judge