## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PAUL F. KILMER,<br>        Plaintiff<br><br>        v.<br><br>U.S. CUSTOMS AND BORDER PROTECTION,<br>        Defendant | Civil Action No. 17-1566 (CKK) |

## MEMORANDUM OPINION
(November 15, 2023)

This lawsuit arises from a Freedom of Information Act ("FOIA") request made by *pro se* Plaintiff Paul Kilmer ("Plaintiff") to Defendant United States Customs and Border Protection ("CBP"). Plaintiff sought records regarding CBP's interactions with individuals seeking entry into the United States to participate in a demonstration known as the "Women's March" in January 2017.

On May 14, 2021, the Court ruled on the parties' motions for summary judgment. *See Kilmer v. U.S. Customs & Border Protect.*, No. 17-1566 (CKK), 2021 WL 1946392 (D.D.C. May 14, 2021). The Court granted summary judgment in favor of CBP regarding the adequacy of the agency's FOIA search, with one exception, discussed at length below. *Id.* at *16. The Court denied without prejudice both parties' respective motions regarding CBP's claimed FOIA exemptions, "segregability," and Plaintiff's request for discovery. *Id.* at 35. The Court further ordered CBP to file a *Vaughn* Index supporting its claimed FOIA exemptions with greater specificity. *Id.* CBP has done so, again moving for summary judgment. *See Vaughn* Index, ECF No. 36-1, ECF No. 36-2. Because CBP's *Vaughn* Index substantiates the agency's claimed FOIA

exemptions, and upon review of the pleadings,[1] the relevant legal authorities, and the record as a whole, for the reasons stated below, the Court shall **GRANT** CBP's [38] Renewed Motion for Summary Judgment and **DENY** Plaintiff's [40] Motion for *In Camera Ex Parte Inspection* and Limited Discovery.  Finally, the Court **DENIES AS MOOT** Plaintiff's Motion for Order Request for Ruling.

## I.    BACKGROUND

The Court assumes the reader's familiarity with this case and refers the reader to its past memorandum opinion for further background.  *See Kilmer*, 2021 WL 1946392, at *1–3.

CBP filed the present Renewed Motion for Summary Judgment in September 2021, alleging that it "satisfied its obligation to conduct adequate searches for records responsive to Plaintiff's FOIA requests and properly withheld exempt information pursuant to [FOIA] Exemptions 5, 6, 7(C) and 7(E)."  Def.'s Renewed Mot. at 13.  In support of its motion, CBP submitted a second supplemental Declaration of Ms. Shari Suzuki, CBP's FOIA Appeals Officer. *See* Def.'s Renewed Mot., Ex. 2 ("Second Supp. Suzuki Decl."), ECF No. 38-2.  Plaintiff opposes summary judgment and moves for the Court to review 59 unredacted pages of the records provided by CBP in response to Plaintiff's FOIA request "to determine whether the redactions/segregations to those records were appropriate[.]"  Pl.'s Opp'n at 2.  Plaintiff also requests for limited discovery due to CBP's alleged misconduct in responding to Plaintiff's FOIA request.  *Id.*  The parties' respective motions are fully briefed and ripe for resolution.

---

[1] The Court's consideration has focused on the following documents:
- Def.'s Renewed Mot. for Summ. J. ("Def.'s Renewed Mot."), ECF No. 38;
- Pl.'s Mem. of P. & A. in Opp'n to Def.'s Renewed Mot. for Summ. J. & Mot. for *Ex Parte, In Camera* Review of Sample Records and for Limited Discovery ("Pl.'s Opp'n"), ECF No. 40-2;
- Def.'s Reply Mem. in Supp. of Mot. for Summ. J. ("Def.'s Reply"), ECF No. 44; and
- Pl.'s Reply in Supp. of Cross-Mot. for *Ex Parte, In Camera* Review ("Pl.'s Reply"), ECF No. 46.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

## II.    LEGAL STANDARD

Congress enacted the Freedom of Information Act, 5 U.S.C. § 552, to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (citation omitted).  Congress also balanced this objective of transparency with the potential that "legitimate governmental and private interests could be harmed by release of certain types of information." *Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992) (en banc) (citation omitted), *cert. denied*, 507 U.S. 984 (1993).  To that end, FOIA "requires federal agencies to make Government records available to the public, subject to nine exemptions for categories of material." *Milner v. Dep't of Navy*, 131 S. Ct. 1259, 1261–62 (2011).  Ultimately, "disclosure, not secrecy, is the dominant objective of [FOIA]." *Rose*, 425 U.S. at 361.  For this reason, the "exemptions are explicitly made exclusive, and must be narrowly construed." *Milner*, 131 S. Ct. at 1262 (citations omitted).

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (PLF) (citing *Bigwood v. U.S. Agency for Int'l Dev.*, 484 F. Supp. 2d 68, 73 (D.D.C. 2007) (PLF)).  "The agency is entitled to summary judgment if no material facts are genuinely in dispute and the agency demonstrates that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information." *Prop. of the People, Inc. v. Off. of Mgmt. & Budget*, 330 F. Supp. 3d 373, 380 (D.D.C. 2018) (RC) (citation omitted); *see* Fed. R. Civ. P. 56(a).

The burden is on the agency to justify its response to the plaintiff's request.  5 U.S.C. § 552(a)(4)(B).  "An agency may sustain its burden by means of affidavits, but only if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called

into question by contradictory evidence in the record or by evidence of agency bad faith." *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (citation omitted). "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *Am. Civ. Liberties Union v. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011) (citations omitted). "Uncontradicted, plausible affidavits showing reasonable specificity and a logical relation to the exemption are likely to prevail." *Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 509 (D.C. Cir. 2011) (citation omitted).

## III.   DISCUSSION

On the merits, CBP has substantiated its withholdings as a matter of law.  Before turning to the merits, however, the Court must address Plaintiff's procedural errors.

### A.  Plaintiff's Briefing

Although *pro se* litigants are held to a more lenient standard than those represented by counsel, they must nevertheless comply with the Federal Rules of Civil Procedure and Local Rules of Civil Procedure, including Local Civil Rule 7(h).  *Moore v. Agency for Int'l Dev.*, 994 F.2d 874, 876 (D.C. Cir. 1993) (citation and internal quotation marks omitted); *Jarrell v. Tisch*, 656 F. Supp. 237, 239 (D.D.C. 1987) (Penn, J.).

Local Civil Rule 7(h) requires all litigants to file "a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement."  LCvR 7(h)(1).  The Rule further provides that "[i]n determining a motion

for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." *Id.*

Here, contrary to Local Civil Rule 7(h), "Plaintiff's Statement of Material Facts in Genuine Dispute" fails to admit or deny any of the seven statements submitted by CBP in its "Statement of Material Facts Not in Genuine Dispute." *Compare* Pl.'s Opp'n, ECF No. 40-1, at 1–2, *with* Def.'s Renewed Mot. at 1–3. Instead, Plaintiff asserts that the "following matters remain in dispute" and raises six issues for the Court to consider. Pl.'s Opp'n, ECF No. 40-1, at 1. Additionally, Plaintiff fails to include any information relevant to its response, let alone specific citations (or even vague references) to the record. *See id.*

Plaintiff's deviation from Local Civil Rule 7(h) undermines its purpose, which is to assist the Court in quickly determining if any facts are actually in dispute. *See Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 153 (D.C. Cir. 1996). Without this Rule, courts would be "obligated to sift through hundreds of pages of [documents] in order to make [their] own analysis and determination of what may, or may not, be a genuine issue of material disputed fact." *Burke v. Gould*, 286 F.3d 513, 518 (D.C. Cir. 2002). And that is the case here—without any citations to the record nor suggested factual support, the Court is left with the task of weeding through Plaintiff's lengthy filings to identify any disputed facts and make sense of Plaintiff's briefing.

As Plaintiff has failed to properly dispute CBP's assertions, the Court must take CBP's statements as undisputed. *See* LCvR 7(h)(1); Fed. R. Civ. P. 56(e). Notwithstanding Plaintiff's deficient Statement of Genuine Issues, the Court will proceed with its analysis.

**B. Merits**

### 1.   **Agency Bad Faith**

Plaintiff first asks the Court "to remove any presumptions to which CBP might otherwise be entitled" given the agency's "bad faith from the outset of this matter and its potential unlawful acts regarding denials of entry to the United States surrounding the Women's March." Pl.'s Opp'n at 6.  In addition, Plaintiff avers that "when an agency has the powers we entrust to CBP (e.g. authority to arrest, detain and refuse entry to the U.S. . . . that agency should be held to a higher standard in responding to FOIA requests, like the present one, that call into question whether it has acted lawfully." *Id.* at 9.  The "higher standard" that should apply, according to Plaintiff, is "strict scrutiny over both the search conducted by CBP and the redactions/segregations of records produced by CBP, including *ex parte*, *in camera* inspection of a sample of the full records produced by CBP in response to [Plaintiff's FOIA] Request." *Id.*  In essence, Plaintiff urges the Court to remove certain presumptions afforded to CBP and instead "proceed under strict scrutiny as to each and every representation made by [CBP] during the course of litigation." Pl.'s Reply at 4.  For the reasons below, the Court declines to find agency bad faith, remove the presumption of good faith, or impose a higher standard on CBP.

To begin, Plaintiff cites no authority for the proposition that "when an agency has the powers we entrust to CBP . . . that agency should be held to a higher standard [i.e., strict scrutiny] in responding to FOIA requests," Pl.'s Opp'n at 9, and the Court is unaware of such precedent. Without something beyond Plaintiff's mere representation, the Court is not inclined to change settled law.

Next, Plaintiff maintains that CBP engaged in "unlawful acts regarding denials of entry to the United States surrounding the Women's March," which, according to Plaintiff, violated the First Amendment rights of certain individuals, including Plaintiff. *Id.* at 6–7.  That may well be

true, but Plaintiff has filed a FOIA case, not, for instance, a *Bivens* claim.  Once again, Plaintiff's speculation regarding CBP's alleged misconduct during the Women's March is insufficiently specific to serve as "evidence that the agency's search" for records under FOIA "was not made in good faith." *Kowal v. U.S. Dep't of Just.*, 464 F. Supp. 3d 376, 382 (D.D.C. 2020) (TJK).

Similarly, the Court is not persuaded by Plaintiff's repeated allegations of bad faith because CBP "denied, twice, that it had records responsive to [Plaintiff's FOIA] Request."  Pl.'s Opp'n at 6; *see id.* ("CBP's denial that it had documents responsive to the Request was also an illegal act by which CBP knowingly and intentionally violated FOIA.").   "[A]n inquiry regarding the adequacy of an agency's search requires a court to focus on the actual search or searches, not on the results of the same." *Barnard v. U.S. Dep't of Homeland Sec.*, 598 F. Supp. 2d 1, 10 (D.D.C. 2009) (CKK) (citing *Weisberg v. Dep't of Just.*, 705 F.2d 1344, 1351–52 (D.C. Cir. 1983)).  In fact, "courts routinely uphold the sufficiency of an[] agency's search even when additional records are located after multiple searches." *Id.*; *see also Airaj v. Dep't of State*, No. 15-983 (ESH), 2016 WL 1698260, at *7 (D.D.C. Apr. 27, 2016) ("[T]he D.C. Circuit has held that the performance of additional searches following an agency's initial response to a FOIA request not only does not discredit the original search, but to the contrary, actually indicates good faith and 'suggest[s] a stronger . . . basis for accepting the integrity of the search.'") (quoting *Meeropol v. Meese*, 790 F.2d 942, 953 (D.C. Cir. 1986)).  CBP's present compliance vitiates a claim of bad faith.

Lastly, Plaintiff argues that CBP has "demonstrated a pattern and practice of being unresponsive to FOIA requests."  Pl.'s Opp'n at 27.  To support this claim, Plaintiff references two other FOIA cases involving CBP.  *See* Suppl. Kilmer Decl., Ex. 10, ECF No. 40-6; *id.*, Ex. 11, ECF No. 40-7; *id.*, Ex. 12, ECF No. 40-8; *id.* Ex. 13, ECF No. 40-9.  The Court is not persuaded

by Plaintiff's argument for two reasons. First, Plaintiff's assertion regarding CBP's "pattern and practice" of misconduct lacks support in the record, as Plaintiff submits only certain documents from the two other FOIA cases, none of which demonstrate agency bad faith because the documents reflect the plaintiffs' allegations of bad faith, not judicial determinations. *See generally* Suppl. Kilmer Decl., Exs. 10–13. Second, as discussed above, the Court declines to find bad faith based on CBP's inability to locate responsive records, which it later discovers and produces to FOIA requesters. *See Airaj*, 2016 WL 1698260, at \*7.

In sum, the Court declines to find agency bad faith in the present case, nor will it remove the presumption of good faith afforded to CBP. The Court will now assess the adequacy of CBP's FOIA search.

### 2. Adequacy of the Search

Plaintiff next challenges the adequacy of CBP's FOIA search. This argument fails too. "An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (citation and internal quotation marks omitted). "The agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Id.* at 326 (citation and internal quotation marks omitted). "The agency cannot limit its search to only one or more places if there are additional sources that are likely to turn up the information requested." *Id.* (citation and internal quotation marks omitted). "At the summary judgment stage, where the agency has the burden to show that it acted in accordance with [FOIA], the court may rely on a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist)

were searched." *Id.* (citation and internal quotation marks omitted).

In its prior opinion, the Court addressed the adequacy of CBP's search and granted summary judgment in favor of CBP with regard to the adequacy of the search, with one exception. *See Kilmer*, 2021 WL 1946392, at *4–14.   As CBP did not address Mr. Joseph DeCunha's declaration, nor did the agency explain whether any of its searches would have targeted Mr. DeCunha, Officer Brendon Quammie, or the Champlain port of entry, the Court concluded that, to complete its adequate search, CBP should run targeted searches for records related to Mr. DeCunha, Officer Quammie, and the Champlain border crossing.   *Id.* at 28.   Alternatively, the Court directed CBP to explain if and how its earlier searches have already addressed these concerns.   *Id.*   CBP's Renewed Motion for Summary Judgment now provides additional information, including a second supplemental declaration of Shari Suzuki.   With this additional information, the Court can now address the outstanding issues regarding the adequacy of CBP's search.

First, CBP asserted a *Glomar* response, declining to confirm or deny "the existence or nonexistence of any records relating to Mr. DeCunha."   Def.'s Renewed Mot. at 15 n. 1.   In doing so, CBP also filed a motion for leave to submit Ms. Suzuki's second supplemental declaration under seal and *ex parte*.   *See* ECF No. 39.   The Court granted CBP's motion and conducted an *in camera* review of the unredacted declaration.   *See* Nov. 01, 2023 Minute Order.

A *Glomar* response is appropriate in "certain cases, [where] merely acknowledging the existence of responsive records would itself cause harm cognizable under a FOIA exemption." *People for the Ethical Treatment of Animals v. NIH ("PETA")*, 745 F.3d 535, 540 (D.C. Cir. 2014) (citation omitted and quotation cleaned up).   A *Glomar* response "is proper if the fact of the existence or nonexistence of agency records falls within a FOIA exemption."   *Wolf v. CIA*,

473 F.3d 370, 374 (D.C. Cir. 2007). "When addressing an agency's *Glomar* response, courts must accord 'substantial weight' to agency determinations." *Sea Shepherd Conservation Soc'y v. IRS*, 208 F. Supp. 3d 58, 89 (D.D.C. 2016) (citing *Gardels v. CIA*, 689 F.2d 1100, 1104 (D.C. Cir. 1982)). Consequently, in such cases, "courts may grant summary judgment on the basis of agency affidavits that contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Elec. Privacy Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012) (internal quotation marks omitted). "The supporting affidavit must justify the *Glomar* response based on general exemption review standards established in non-*Glomar* cases." *Id.* (internal quotation marks omitted). Ultimately, "an agency's justifications for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Id.* (citation omitted).

Here, Ms. Suzuki explains in the unredacted declaration the justifications for invoking a *Glomar* response. Second Supp. Suzuki Decl., ECF No. 38-2, ¶ 14. Upon review of the declaration, the Court is satisfied with Ms. Suzuki's explanations. Moreover, Plaintiff does not oppose CBP's *Glomar* response in his opposition. The Court finds that CBP's *Glomar* response was justified, and, upon review of the unredacted declaration, the Court concludes that CBP adequately performed its FOIA search with respect to Mr. DeCunha.

Next, with respect to Officer Quammie, CBP explains that it is not standard practice for individual officers or employees to maintain a "separate set of records related to specific inadmissibility determinations at ports of entry." Def.'s Renewed Mot. at 17; Second Supp. Suzuki Decl. ¶ 13 ("[T]he practice is for officers to maintain records on traveler admissibility via the centralized law enforcement systems and email records that CBP queried[.]"). Instead, CBP employs "a standardized approach to record the screening process and any inadmissibility

determination in a manner that allows the records to be readily accessible from a centralized database." Def.'s Renewed Mot. at 17. CBP therefore did not contact individual officers involved in the processing of travelers as part of its FOIA search—including Officer Quammie—because the agency "had no reason to believe" that a particular officer would store separate records on "any particular traveler independent of information entered into the law enforcement database or that might have been recorded in an email." *Id.* at 18; *see* Second Supp. Suzuki Decl. ¶ 13 (noting that over the relevant time period for Plaintiff's request, "the Buffalo Field Office alone reportedly processed 41,000 vehicles and 100,000 passengers" and therefore "the sheer volume of that traffic also makes it unlikely that any individual officer would have created files on any individual passenger in addition to the efficient, streamlined inspection process . . . [of] the centralized law enforcement systems.").

Lastly, with respect to the Champlain port of entry, CBP explains that its FOIA search at the Buffalo Field Office would have encompassed the Champlain border crossing, including any records created by officers at that location that would have been responsive to Plaintiff's FOIA request. Def.'s Renewed Mot. at 18; Second Supp. Suzuki Decl. ¶¶ 11–12. Ms. Suzuki also explains that managers at the Buffalo Field Office and port of entries within the Buffalo Field Office—including the Champlain port of entry—"manually searched all email traffic and other records" during the relevant time period for responsive records to Plaintiff's FOIA request. Second Supp. Suzuki Decl. ¶¶ 8, 12.

Plaintiff's three opposing arguments as to the adequacy of CBP's search are unavailing and do not merit much discussion.[2] *First*, Plaintiff alleges that CBP's motion goes beyond the scope

---

[2] Plaintiff also attempts to raise a new issue regarding the adequacy of the search due to "CBP's mischaracterization of the Request[.]" Pl.'s Opp'n at 5. Specifically, Plaintiff takes issue with the fact that CBP "contends that the Request included six subparts that generally sought information regarding individuals seeking entry into the United States from Canada during a three-day period in January 2017 associated with the Women's March who were deemed inadmissible

of the Court's prior opinion, and, consequently, "call[s] upon the Court to reconsider that portion of its decision of May 14th regarding the adequacy of CBP's search." Pl.'s Opp'n at 13–14. The Court disagrees. CBP's present motion addresses the specific concerns discussed in the Court's prior opinion with respect to the adequacy of the search. *See* Def.'s Renewed Mot. at 8–10.

*Second*, Plaintiff once again objects to the search terms used by CBP. *See* Pl.'s Opp'n at 14–15 (criticizing CBP for "disparate search terms used by various parts of CBP" and for not using certain proposed search terms). The Court addressed this objection in its prior opinion, *see Kilmer*, 2021 WL 1946392, at *11, and, as this issue has already been decided, the Court sees no basis to reconsider its prior analysis with respect to CBP's search terms.

*Third and finally*, Plaintiff argues that CBP did not conduct an adequate search because he "uncovered a 2017 letter (the year of the Request) to CBP from the United States Senate's [sic] Committee on Homeland Security and Governmental Affairs in which the Senate oversight committee notes that CBP agents have used 'workaround solutions' for communicating with one another." Pl.'s Opp'n at 15; *see* Supp. Kilmer Decl., Ex. 14, ECF No. 40-10 (copy of letter). However, the 2017 letter addresses issues that the agency was experiencing with its land mobile radio system in remote locations. Def.'s Reply at 4; Supp. Kilmer Decl., Ex. 14, ECF No. 40-10. The letter states that "[a] strategy that is perfectly appropriate at ports of entry, where radio coverage is more reliable, may not meet the needs of Border Patrol agents patrolling rural and remote areas along the Southwest and Northwest borders." Supp. Kilmer Decl., Ex. 14, ECF No. 40-10, at 2. As letter does not suggest that these "workable solutions" were utilized at ports

---

by CBP." *Id.* (citation and internal quotation marks omitted). However, Plaintiff admits that his "FOIA request [] was aimed at determining whether CBP unlawfully or otherwise inappropriately denied entry to the United States to certain persons because they indicated they were travelling . . . to participate in the protest and demonstration commonly referred to as the Women's March, which occurred on January 21, 2017[.]" *Id.* at 1-2. In any event, notwithstanding this generalization, CBP conducted its search as to each item of Plaintiff's FOIA request. *See Kilmer*, 2021 WL 1946392, at *4–8.

of entry, the Court concludes that it has no bearing on the adequacy of CBP's search.

In sum, the Court concludes that CBP's searches were adequate.

### 3.  FOIA Exemptions

Plaintiff also challenges CBP's claimed exemptions.  Previously, the Court denied without prejudice the parties' respective motions with regard to CBP's claimed exemptions.  *See Kilmer*, 2021 WL 1946392, at *16.  The Court further ordered CBP to submit a *Vaughn* Index that "support[s] its claimed FOIA exemptions with greater particularity."  *Id.*  On July 15, 2021, CBP submitted a 298-page *Vaughn* Index, identifying each responsive document and each redaction applied, as well as the basis for each redaction.  *See generally Vaughn* Index, ECF No. 36-1; ECF No. 36-2.

An agency bears the burden of demonstrating the applicability of the FOIA exemptions it claims.  *Pub. Inv'rs Arb. Bar Ass'n v. SEC*, 771 F.3d 1, 3 (D.C. Cir. 2014).  "Typically, the agency demonstrates the applicability of a FOIA exemption by providing affidavits regarding the claimed exemptions."  *Shapiro v. U.S. Dep't of Just.*, 893 F.3d 796, 799 (D.C. Cir. 2018).  The agency may also submit "a detailed description of the information withheld through the submission of a so-called '*Vaughn* Index.'"  *Defenders of Wildlife*, 623 F. Supp. 2d at 88 (citing *Vaughn v. Rosen*, 484 F.2d 820, 826–27 (D.C. Cir. 1973)).  "The *Vaughn* Index and/or accompanying affidavits or declarations must 'provide[ ] a relatively detailed justification, specifically identif[y] the reasons why a particular exemption is relevant, and correlat[e] those claims with the particular part of a withheld document to which they apply.'"  *Id.* (quoting *Jud. Watch, Inc. v. FDA*, 449 F.3d 141, 146 (D.C. Cir. 2006)).  "Withholding information under conclusory, generalized, or sweeping allegations of exemptions is not acceptable."  *Elec. Priv. Info. Ctr. v. DEA*, 192 F. Supp. 3d 92, 103 (D.D.C. 2016) (EGS).

Of the 937 pages of responsive records CBP has produced, the agency initially applied redactions to 870 pages pursuant to four FOIA exemptions: Exemptions 5, 6, 7(C), and 7(E).  *See* Suzuki Decl., ECF No. 19-1, ¶ 8.  In preparing the *Vaughn* Index, however, CBP identified additional non-exempt information that it was able to segregate from exempt information, and, as a result, lifted certain redactions and reproduced approximately 88 pages[3] to Plaintiff on September 10, 2021.  Second Supp. Suzuki Decl. ¶¶ 22–23.  The remaining redactions continue to be exempt under the claimed FOIA exemptions.  *Id.* ¶ 24.  Broadly speaking, these exemptions implicate the agency's deliberative decision-making process (Exemption 5), personal privacy rights (Exemptions 6 and 7(C)), and law enforcement functions (Exemption 7(E)).  *See* 5 U.S.C. § 552(b)(5)-(7).  Plaintiff objects to each of these claimed exemptions on multiple grounds.  *See* Pl.'s Opp'n at 15–22.  The Court will address each exemption separately.

### a.  FOIA Exemption 5

Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  It applies to materials that would be privileged in the civil discovery context, such as materials protected by the deliberative process privilege, the attorney-client privilege, and the attorney work-product privilege.  *Nat'l Lab. Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).  In order to "justify nondisclosure under Exemption 5, an agency must show that the type of material it seeks to withhold is generally protected in civil discovery for reasons similar to those asserted by the agency in the FOIA context."  *Burka v. U.S. Dep't of Health & Human Servs.*, 87 F.3d 508, 518 (D.C. Cir. 1996).  In this case, CBP invoked the deliberative process privilege to withhold information under Exemption 5.  Def.'s Renewed Mot. at 28.

---

[3] Plaintiff states that CBP reproduced "some 72 pages."  Pl.'s Opp'n at 17.  Ms. Suzuki, however, lists 88 records that were reproduced to Plaintiff, with no duplicate record numbers listed.  *See* Second Supp. Suzuki Decl. ¶ 23.

The deliberative process privilege is intended to "prevent injury to the quality of agency decisions." *Sears, Roebuck & Co.*, 421 U.S. at 151. The privilege "serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).

For this privilege to apply, the agency must establish that the material at issue is both "predecisional" and "deliberative" in nature. *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785–86 (2021). "A document is predecisional if it was 'prepared in order to assist an agency decision maker in arriving at his decision,' rather than to support a decision already made." *Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quoting *Renegotiation Bd. v. Grummation Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975)). To determine whether a document was prepared to assist an agency decisionmaker in arriving at the decision, the Court must "consider whether the agency treats the document as its final view on the matter." *Jud. Watch, Inc. v. U.S. Dep't of Just.*, 20 F.4th 49, 54 (D.C. Cir. 2021) (quoting *U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 786). A document is deliberative if "it reflects the give-and-take of the consultative process," *Coastal States Gas Corp.*, 617 F.2d at 866, and if it was "prepared to help the agency formulate its position," *U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 786; *see also Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 876 (D.C. Cir. 2010) ("To qualify under Exemption 5, a document must also be a direct part of the deliberative process in that it makes recommendations

or expresses opinions on legal or policy matters.").

Here, CBP withheld four types of information that it "reasonably foresees would disclose the deliberative process protected under [Exemption 5] and discourage employees from providing their candid opinions and recommendations to decisionmakers without fear of public disclosure[.]" Second Supp. Suzuki Decl. ¶ 16.

*First*, CBP withheld information regarding "internal deliberations about enforcement action statistics before final numbers were decided." *Id.* ¶ 17.  Ms. Suzuki avers that this information "would reveal CBP employees' deliberative thought processes, including revealing the process of gathering information and numbers to draft proposed statements for enforcement statistics." *Id.*  She then explains that the disclosure of this process "would be reasonably foreseen to chill internal deliberations about enforcement numbers, impacting agency operations and discouraging candid discussion regarding how and what information it releases to the public as employees could fear their deliberative thoughts being made available for public consumption." *Id.*

In response, Plaintiff offers little more than a banal truism: a "statistic is a statistic."  Pl.'s Reply at 7.  The *Vaughn* Index reveals, however, that CBP deliberated over statistics, and consequently withheld portions of an email chain "regarding *internal deliberations* about enforcement statistics" because they were made by CBP employees "in deciding what statistics to publish."  *Vaughn* Index, ECF No. 36-1, at 48 (emphasis added).  Such information is plainly predecisional and deliberative as they express thoughts on information that the agency should make publicly available.  The Court further agrees with CBP that revealing information regarding statistics that were not finalized "would confuse the public as to the actual numbers of specific enforcement actions taken as multiple conflicting numbers would be available and the incorrect

numbers would be confused as the true totals." *Id.*; *see also id.* at 48–49 ("Deliberative statements reflecting opinions about how to frame statistics would cool agency deliberation on how to express agency's operations, specifically regarding admission and law enforcement encounters at the border, to the public."). The Court finds that this withholding was proper under Exemption 5.

*Second*, CBP withheld information regarding "internal deliberations on an anticipated question from Congress that was ultimately not asked." Second Supp. Suzuki Decl. ¶ 18. Ms. Suzuki explains that the disclosure of this anticipated question, as well as the agency's proposed responses, "would be reasonably foreseen to chill internal deliberations, impacting agency operations and discouraging candid discussion about brainstorming regarding potential avenues of Congressional inquiry and how to present information to Congress as employees could fear their exchange of ideas, feedback, and debate would be made available for public consumption." *Id.* And "release may cause confusion and mislead the public because such information was ultimately not conveyed to Congress." *Id.*

Plaintiff argues that this information "is neither predecisional nor a result of a deliberative process," but rather the "result of a single individual, who consulted with no one else, deciding not to produce information to members of Congress." Pl.'s Opp'n at 21–22. CBP, however, explains that the decisionmaker within the Office of Congressional Affairs believed this question may be raised by Congress, but ultimately decided against including an answer to it in the agency's finalized response to Congress. *Vaughn* Index, ECF No. 36-1, at 137. Releasing this information "would disclose the CBP decision maker's initial deliberations based on a conversation with members of Congress that were not, in fact, ultimately part of CBP's response," and therefore would "prevent employees from trying to predict inquiries, hindering the agency's readiness to respond to inquires and shed light on the operations of the agency." *Id.* The Court concludes that

CBP has satisfactorily shown that this information was predecisional in that it was created before CBP provided its responses to Congress, and deliberative as the information expresses the thoughts and impressions of a CBP employee prior to formulating the agency's responses to Congress. *See U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 786 (discussing deliberative process privilege and noting "some ideas are discarded or simply languish[,] [y]et documents discussing such dead-end ideas can hardly be described as reflecting the agency's chosen course"). The Court therefore finds that this withholding was proper under Exemption 5.

*Third*, CBP withheld information regarding "draft press releases." Second Supp. Suzuki Decl. ¶ 19. The *Vaughn* Index reveals that information was withheld for a draft that "was not in final form for publication, and its content was still being deliberated." *Vaughn* Index, ECF No. 39-1, at 52. Ms. Suzuki explains that the disclosure of this information "would be reasonably foreseen to suppress what employees would be willing to provide and propose regarding the successes of operations and details of what is occurring on the ground in real-time that can help to ensure the accuracy and context of public releases." Second Supp. Suzuki Decl. ¶ 19. Plaintiff, on the other hand, argues that the draft press releases "contain factual material" that "would be discoverable in litigation." Pl.'s Opp'n at 22. The Court finds that the drafts at issue are "deliberative" in that CBP employees were discussing what to include in public statements, thereby reflecting "the give-and-take" of the decisionmaking process. *Coastal States Gas Corp.*, 617 F.2d at 866; *id.* ("The exemption [] covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency."); *see also Leopold, et al. v. Off. of Dir. of Nat'l Intelligence, et al.*, 442 F. Supp. 3d 266, 277 (D.D.C. 2020) (CKK) ("As long as communications are pre-decisional and deliberative, internal agency communications about public statements can be protected by the deliberative

process privilege."). Accordingly, CBP's decision to withhold this information was proper under Exemption 5.

*Fourth and finally*, CBP withheld information regarding "admissibility deliberations and discussion on what aspects of the inspection process and admissibility may be highlighted by the agency in public statements." Second Supp. Suzuki Decl. ¶ 20. Ms. Suzuki states that the disclosure of "such back-and-forth dialogue between agency employees on what aspects of the inspection process can be publicly shared would be reasonably foreseen to cause employees to not communicate freely in making decisions as to how to present the operations of the agency to the public as their opinions could be made available to the public, preventing those with insight into specific enforcement actions from providing candid contextual information." *Id.*

Plaintiff does not meaningfully challenge CBP's redactions in this regard, electing to broadly claim that CBP's assertions are "conclusory in nature." Pl.'s Opp'n at 21. However, the *Vaughn* Index reveals, for instance, that a portion of an email chain was redacted because it included a "CBP employee's distillation of what should be made public" as to a decision made during the entry process. *Vaughn* Index, ECF No. 36-1, at 81–82. The Court agrees that the disclosure of this information "would cause employees to not communicate freely in making decisions as to how to present the operations of the agency to the public as their opinions would be made public." *Id.* at 82. The Court finds that this satisfies the deliberative process privilege and therefore the redactions were proper under Exemption 5.

In sum, Plaintiff has failed to present evidence contradicting Ms. Suzuki's declaration or coloring the agency's Exemption 5 redactions in bad faith. Accordingly, the Court finds that CBP's withholding of material pursuant to FOIA Exemption 5 was proper.

### b.  FOIA Exemptions 6 & 7(C)

In this case, CBP invoked both Exemption 6 and Exemption 7(C) to redact "personally identifiable information" regarding government employees, third-party travelers, and journalists. Def.'s Renewed Mot. at 24; Def.'s Reply at 9.  The Court will address the threshold requirements for the exemptions before focusing its attention on Exemption 7(C).  *See, e.g.*, *U.S. Dep't of Just. v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 762 n.12 (1989) ("Because Exemption 7(C) covers this case, there is no occasion to address the application of Exemption 6."); *Roth v. U.S. Dep't of Just.*, 642 F.3d 1161, 1173 (D.C. Cir. 2011) ("[W]e shall focus on Exemption 7(C) rather than Exemption 6 since it is the broader of the two.").

Exemption 6 protects information contained in "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).  The purpose of this exemption is "to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information."  *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 599 (1982).  Similarly, Exemption 7(C) exempts documents compiled for law enforcement purposes that "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  In order for records to qualify for this exemption, the agency must first demonstrate that the documents were compiled for law enforcement purposes.  *See Rural Hous. All. v. U.S. Dep't of Agric.*, 498 F.2d 73, 80 (D.C. Cir. 1974).

As an initial matter, the Court finds that the information withheld by CBP satisfies the threshold requirement for Exemption 6.  The term "similar files" is construed broadly and is intended "to cover detailed Government records on an individual which can be identified as applying to that individual."  *Wash. Post Co.*, 456 U.S. at 602 (citation omitted).  "The threshold is fairly minimal, such that all information which applies to a particular individual is covered by

Exemption 6, regardless of the type of file in which it is contained." *Concepcion v. FBI*, 606 F. Supp. 2d 14, 35 (D.D.C. 2009) (RMU) (citations and internal quotation marks omitted).  Here, CBP redacted information involving specific government employees and third parties.  Suzuki Decl., ECF No. 19-1 ¶¶ 37–39.  Therefore, the threshold requirement for Exemption 6 is satisfied.

Similarly, the threshold requirement for Exemption 7(C) is satisfied.  Judicial review of an agency's withholding under Exemption 7 "requires a two-part inquiry": first, whether the information was in fact compiled for law enforcement purposes, and second, whether it fits one of the (A)-(F) standards.  *F.B.I. v. Abramson*, 456 U.S. 615, 622 (1982).  For the first prong, to show that the disputed documents were "compiled for law enforcement purposes," the agency need only "establish a rational nexus between the investigation and one of the agency's law enforcement duties and a connection between an individual or incident and a possible security risk or violation of federal law." *Campbell v. Dep't of Just.* 164 F.3d 20, 32 (D.C. Cir. 1998) (citation and internal quotation marks omitted).  Here, CBP writes that it "performs a law enforcement function in connection with its activities along the United States border, including at ports of entry."  Def.'s Renewed Mot. at 11; *see* Suzuki Decl., ECF No. 19-1, ¶ 41 ("The records at issue were compiled for law enforcement purposes in that the information is collected and used by CBP in its mission to secure the border of the United States, which is a law enforcement function.")  As CBP is "entitled to deference in its determination that the records were compiled for a law enforcement purpose," *Gilman v. U.S. Dep't of Homeland Sec.*, 32 F. Supp. 3d 1, 19 (D.D.C. 2014) (BAH), the information withheld was in fact "compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7). With these threshold requirements addressed, the Court will now turn to the second prong for Exemption 7(C).

To determine whether Exemption 7 applies once the threshold requirement is met, a court

must "weigh the 'privacy interest in non-disclosure against the public interest in the release of the records.'"  *Lepelletier v. FDIC*, 164 F.3d 37, 46 (D.C. Cir. 1999) (quoting *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989)).  As stated by the D.C Circuit,

> The public interest to be weighed against the privacy interest in this balancing test is the extent to which disclosure would serve the core purposes of the FOIA by contribut[ing] significantly to the public understanding of the operations or activities of the government.  Thus, unless a FOIA request advances the citizens' right to be informed about what their government is up to, no relevant public interest is at issue.

*Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 33–34 (D.C. Cir. 2002) (citation and internal quotation marks omitted).  When the requester advances revealing government misconduct as the applicable public interest, the requester must "produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred."  *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004).  For the public interest to prevail over the privacy interest, the requester must provide "compelling evidence that the agency is engaged in illegal activity," *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1205–06 (D.C. Cir. 1991), far "more than a bare suspicion" of official misconduct, *Favish*, 541 U.S. at 174.

Here, CBP applied Exemptions 6 and 7(C) to redact "personally identifiable information" involving government employees, including CBP law enforcement, and third parties.  Def.'s Renewed Mot. at 24.

With respect to government employees, redactions were applied to names, phone numbers, email addresses, and identifying position titles.  Suzuki Decl., ECF No. 19-1, ¶¶ 45–47.  It is well settled that law enforcement personnel and government employees have a substantial interest in anonymity.  *See Lamb v. Millennium Challenge Corp.*, 334 F. Supp. 3d 204, 216–17 (D.D.C. 2018) (RDM) (noting that "government investigators and employees 'have a legitimate interest in preserving the secrecy of matters that conceivably could subject them to annoyance or harassment

in either of their official or private lives'") (quoting *Lesar v. U.S. Dep't of Just.*, 636 F.2d 472, 487 (D.C. Cir. 1980)).  Plaintiff only challenges CBP's decision to disclose information involving Senior Executive Service ("SES") employees, but not other CBP employees.  Pl.'s Opp'n at 20 (requesting CBP to explain "why some of its employees deserve anonymity under exemptions (b)(6) and (b)(7)(C) and other[s] do not").  CBP explains this distinction, stating that it released the "names of SES-level employees because it determined they have a diminished privacy interest given their high-level position and the greater public visibility associated with their position as compared to lower-level employees, which also gives rise to a public interest that is absent with lower level personnel."  Def.'s Reply at 10.  The Court is satisfied with CBP's reasoning, concluding that the records logically fall within the claimed exemption.  Accordingly, the Court finds that no public interest outweighs the privacy interests of the government employees in the redacted records, and therefore CBP's application of Exemption 7(C) in this regard was justified.

CBP also withheld "personally identifiable information" of third-party travelers, including names, dates of birth, country of birth, age, gender, certain physical characteristics, photographs, fingerprints, criminal records, travel plans, and addresses.  Suzuki Decl., ECF No. 19-1, ¶ 48.  Plaintiff objects to these redactions, arguing that revealing the "age, sex, and citizenship of those denied entry will not disclose the identity of any specific individual."  Pl.'s Opp'n at 18; *see id.* at 18–19 (noting Canada has 37 million residents and therefore it is "not feasible" to identify individuals using only their age, sex, and citizenship).  The public interest identified by Plaintiff is "whether CBP may have targeted certain groups (e.g. Canadian males under the age of 30) for disparate treatment that may amount to unlawful targeting without just cause."  *Id.* at 18.  Similarly, citizenship information "will also help disclose how many U.S. citizens were effectively denied entry to their own country because a Canadian citizen was their 'ride' to the Women's March."

*Id.* at 19.  However, CBP explains that while thousands of travelers may have been screened during the relevant time period, the criteria that Plaintiff asked CBP to use to narrow Item 2 of his FOIA request resulted in the processing of records for a small subset of people (less than 20).  *See* Supp. Suzuki Decl., ECF No. 25-3, ¶ 25 (explaining less than 20 individuals "fell within the plaintiff's narrowed criteria for [part 2] of the request").  Moreover, Plaintiff included in the Complaint news articles written about individuals claiming that they were denied entry due to an expressed interest in attending the Women's March.  *See* Compl., ECF No. 1, ¶ 4 n.1.  Accordingly, as Ms. Suzuki explains, "it is possible that the public may try to connect certain dots and make assumptions as to whether individuals in the news reports were the same people as those in the records released by CBP."  Supp. Suzuki Decl., ECF No. 25-3, ¶ 25.  CBP therefore determined that to protect the privacy interests of the third parties whose information is contained in the documents, it was insufficient to redact only their names in the documents.  *Id.*  There is a significant privacy interest in nondisclosure of this information.  *See Horvath v. U.S. Secret Serv.*, 419 F. Supp. 3d 40, 48 (JDB) (D.D.C. 2019) (determining it is appropriate to redact additional personal information when the information withheld concerns a small group of individuals and therefore disclosure would reveal the individuals' identities).

On the other side of the balancing equation, Plaintiff avers that this information would support findings of illegal activity (i.e., improperly denying entry to the United States).  Pl.'s Opp'n at 19.  However, because "[a]llegations of government misconduct are easy to allege and hard to disprove, . . . courts must insist on a meaningful evidentiary showing" before weighing the competing interests."  *Favish*, 541 U.S. at 175 (citation and internal quotation marks omitted).  "A mere desire to review how an agency is doing its job, coupled with allegations that it is not, does not create a public interest sufficient to override the privacy interests protected by Exemption

7(C)."  *McCutchen v. Dep't of Health & Human Servs.*, 30 F.3d 183, 188 (D.C. Cir. 1994); *see also Sussman v. U.S Marshal Serv.*, 494 F.3d 1106, 1115 (D.C. Cir. 2007) ("[B]are and undeveloped allegations" of agency impropriety do not suffice).  Absent production of "evidence that would warrant a belief by a reasonable person that . . . Government impropriety might have occurred," *Sussman*, 494 F.3d at 1115 (quoting *Favish*, 541 U.S. at 174), a plaintiff cannot demonstrate the existence of a public interest weighing in favor of releasing private information.

Plaintiff has not met this burden here.  While Plaintiff does allege misconduct, his "bare and undeveloped allegations would not warrant a belief by a reasonable person that impropriety might have occurred."  *Sussman*, 494 F.3d at 1115; *see McCutcheon*, 30 F.3d at 189 (requester must provide "compelling evidence" of official misconduct).  And, while Plaintiff may "check the thoroughness of [CBP's] work" by learning the identities of the third-party travelers, the Court will not force the agency to turn over the information involving third parties "simply because someone has accused it of wrongdoing."  *McCutcheon*, 30 F.3d at 190.  In sum, the Court concludes that the scale tilts in favor of privacy and that CBP properly withheld the information under Exemption 7(C).

Lastly, Plaintiff takes issue with CBP's decision to apply redactions to emails received from and sent to persons outside the agency, including journalists.  Pl.'s Opp'n at 19.  However, Plaintiff offers no reason to conclude that the identity of third-party journalists would advance any public interest.  *See id.* at 20.  Accordingly, the Court finds that their private interests control under Exemption 7(C).  *See Mays v. Drug Enf. Admin.*, 23 F.3d 1324, 1327 (D.C. Cir. 2000) ("Absent exceptional circumstances, the balance categorically favors withholding the names and addresses of third parties as the type of information sought is simply not very probative of an agency's behavior or performance.")

In sum, there are significant privacy interests in the nondisclosure of the information withheld by CBP pursuant to Exemptions 6 and 7(C).  *See, e.g.*, *Jud. Watch, Inc.*, 449 F.3d at 153 (finding that individuals have a privacy interest in the nondisclosure of their names so as to avoid physical danger); *Wash. Post Co.*, 456 U.S. at 600 ("Information such as place of birth, date of birth, date of marriage, employment history, and comparable data . . . would be exempt from any disclosure that would constitute a clearly unwarranted invasion of personal privacy."); *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d at 875 ("[T]he privacy interest of an individual in avoiding the unlimited disclosure of his or her name and address is significant, as several other circuits have held.").  The Court finds that CBP's withholdings under Exemptions 6 and 7(C) to be proper.

### c.   FOIA Exemption 7(E)

Finally, Exemption 7(E) permits the withholding of "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques or procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of law." 5 U.S.C. § 552(b)(7)(E).  This "exemption looks not just for circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk."  *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009).  Exemption 7(E) sets a relatively low bar for the agency to justify withholding: "Rather than requiring a highly specific burden of showing how the law will be circumvented, exemption 7(E) only requires that the [agency] demonstrate logically how the release of the requested information might create a risk of

circumvention of the law." *Id.* at 1194 (internal quotation marks and alternations omitted).

The Court incorporates its analysis regarding the threshold for any Exemption 7 withholding, finding that the materials at issue were compiled for law enforcement purposes.

CBP invoked Exemption 7(E) to redact information related to the "processing of individuals at the border (i.e., records related to individuals who were inspected and determined to be inadmissible to the United States), which included the following types of information: database names, internal codes, incident report numbers, record identification numbers, results of law enforcement database queries, and descriptions of law enforcement techniques and procedures regarding database queries and CBP's processing of travelers at the border." Def.'s Renewed Mot. at 21; *see* Suzuki Decl., ECF No. 19-1, ¶¶ 50–59. The *Vaughn* Index reveals that the redacted information "includes the kind of information CBP considered in evaluating admissibility as well as remarks based on that information," and that the disclosure of this information "would reveal CBP techniques and procedures related to inspection and potentially allow individuals to evade detection" as the information "includes details regarding specific information CBP considers and questions that are asked to determine admissibility." *Vaughn* Index, ECF No. 36-1, at 6. Moreover, the release of this information, including agency codes, "would enable an individual knowledgeable in computer mainframes and systems to improperly access the system, facilitate navigation or movement through the system, allow manipulation or deletion of data and interfere with enforcement proceedings." *Id.*

Plaintiff challenges these redactions on two grounds. First, Plaintiff argues that the exemption does not apply because he has "provided unrefuted evidence that at least some of the purported law enforcement techniques that would be disclosed in CBP's records are a matter of common knowledge and can be found in a simple internet search." Pl.'s Opp'n at 17. Next,

Plaintiff takes issue with the identification numbers being redacted because such information "would be helpful in determining how many individuals were denied entry since it appears CBP has produced multiple records regarding the same denial of entry." *Id.* According to Plaintiff, the disclosure of reference numbers would not implicate law enforcement techniques and are merely a part of general recordkeeping. *Id.*

The Court concludes that CBP demonstrated logically how disclosing this type of information could reasonably be expected to create a risk of circumvention by revealing how CBP's databases and records work, and rendering them more vulnerable to manipulation, which suffices to justify invocation of Exemption 7(E). *See Parker v. U.S. Immigr. & Customs Enf't*, 238 F. Supp. 3d 89, 100 (D.D.C. 2017) (RC) (approving agency's use of Exemption 7(E) to redact "sensitive database and event codes, identification numbers, law enforcement system URLS, internal website links, record identification numbers, event numbers, category codes" and other codes); *see also Gilman*, 32 F. Supp. 3d at 21 (D.D.C. 2014) (noting that CBP's specific use of information that may be generally known to the public may still be unknown and may risk circumvention of the law); *Skinner v. U.S. Dep't of Just.*, 893 F. Supp. 2d 109, 114 (D.D.C. 2012) (PLF), *aff'd sub nom. Skinner v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 12-5319, 2013 WL 3367431 (D.C. Cir. May 31, 2013) ("Although the computer access codes are not themselves 'guidelines for law enforcement investigations or prosecutions' . . . the declarant adequately demonstrates that release of the codes 'would disclose guidelines for law enforcement investigations or prosecutions[, and that] such disclosure could reasonably be expected to risk circumvention of the law.").

In sum, the Court finds that CBP properly withheld information pursuant to the four FOIA exemptions discussed at length above.

### 4. **Segregability**

The Court will now assess whether CBP satisfied its obligation to disclose all reasonably segregable material.

FOIA requires that "[a]ny reasonably segregable portion of [the] records shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). An agency must provide a "detailed justification" and not just make "conclusory statements" to support its segregability determinations. *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977). At the same time, agencies "are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which can be overcome by contrary evidence produced by the requester. *Sussman*, 494 F.3d at 1117. Furthermore, a district court need not "order an agency to commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content." *Mead Data Cent.*, 566 F.2d at 261 n.55.

In this case, Plaintiff alleges broadly that CBP failed to satisfy its segregability obligations. *See* Pl.'s Opp'n at 23. Plaintiff offers no evidence, relying solely on his allegation that the agency failed to reasonably segregate information "and that, due to CBP's bad faith, its assessment of what constitutes proper segregation cannot be trusted." *Id.* Such unsubstantiated assertions fail to rebut the presumption of good faith. *See Sussman*, 494 F.3d at 1117 (rebutting presumption requires some "quantum of evidence").

Even without the presumption, CBP produced evidence sufficient to carry its burden on segregability. Courts in this Circuit have found that where the agency conducted a document-by-document review of all responsive records—or here, an even more specific line-by-line review— and determined that nothing within those records were reasonably segregable, the agency has

demonstrated its compliance with FOIA's segregability requirement. *See Ctr. for Pub. Integrity v. U.S. Dep't of Def.*, 486 F. Supp. 3d 317, 330 (D.D.C. 2020) (CKK) (finding DOD's obligation satisfied after looking to DOD's declaration that they conducted a page-by-page and line-by-line review and determined that no further segregation could be made); *DiBacco v. U.S. Dep't of Army*, 983 F. Supp. 2d 44, 65–66 (D.D.C. 2013) (CKK) (finding that agency met segregability requirement when it performed document-by-document review and Plaintiffs offered no evidence to rebut the assertion that it produced all reasonably segregable material); *aff'd in part, remanded in part sub nom. DiBacco v. U.S. Army*, 795 F.3d 179 (D.C. Cir. 2015).

As discussed above, CBP withheld information responsive to Plaintiff's FOIA request under Exemptions 5, 6, 7(C), and 7(E).  Second Supp. Suzuki Decl. ¶ 24.  CBP did not withhold any responsive records in full.  *Id.*  Ms. Suzuki avers that she previously "reviewed the documents determined to be responsive, line-by-line, to identify information exempt from disclosure or for which a discretionary waiver of exemption could apply[.]"  Suzuki Decl., ECF No. 19-1, ¶ 60. And, in preparing the *Vaughn* Index, CBP conducted another review of the responsive records, this time page-by-page.  Second Supp. Suzuki Decl. ¶ 24.  During that review, CBP identified additional non-exempt information that could be segregated from exempt information, and subsequently removed the redactions as appropriate and reproduced those pages to Plaintiff on September 10, 2021.  *Id.* ¶ 22.  Ms. Suzuki avers that further non-exempt information cannot be reasonably segregated "because it is so intertwined with protected material that segregation is not possible or its release would reveal the underlying protected material."  *Id.* ¶ 24.  FOIA requires nothing more of CBP.  *ACLU v. CIA*, 109 F. Supp. 3d 220, 244 (D.D.C. 2015) (RMC).  The Court is satisfied that CBP has appropriately segregated non-exempt material, which has been produced to Plaintiff.

### 5.  *In Camera* Review & Limited Discovery

Plaintiff requests that the Court conduct an *in camera* review of 59 specific pages that were produced to Plaintiff by CBP.  Pl.'s Opp'n at 23.  Plaintiff maintains that *in camera* review is "particularly appropriate" in this case given the "evidence of agency bad faith."  *Id.* at 23.  The Court finds that an *in camera* review of the proposed records is neither necessary nor appropriate.

FOIA "endorses the court with broad discretion" to determine whether *in camera* inspection is appropriate.  *Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*, 384 F. Supp. 2d 100, 119 (D.D.C. 2005) (Urbina, J.).  "Ultimately, however, courts disfavor *in camera* inspection and it is more appropriate in only the exceptional case."  *Id.* (citing *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978)) (explaining that FOIA's *in camera* review provision "is designed to be invoked when the issue before the District Court could not otherwise be resolved"); *see also Larson v. Dep't of State*, 565 F.3d 857, 869–70 (D.C. Cir. 2009) ("*In camera* review is available to the district court if the court believes it is needed to make a responsible de novo determination on the claims of exception.").  The D.C. Circuit has made clear that "[w]hen the agency meets its burden by means of affidavits, *in camera* review is neither necessary nor appropriate."  *Larson*, 565 F.3d at 870 (quoting *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1387 (D.C. Cir. 1979)).

As discussed above, the Court finds that CBP has established that the responsive records logically and plausibly fall within the claimed exemptions.  It would not be proper for the Court to conduct further review "in order to second guess [the agency's] determinations."  *Unrow Human Rts. Impact Litig. Clinic v. U.S. Dep't of State, et al.*, 134 F. Supp. 3d 262, 277 (D.D.C. 2015) (KBJ).  While Plaintiff relies primarily on arguments of agency bad faith to justify *in camera* review, Pl.'s Opp'n at 23–24, the Court has already addressed why these arguments lack merit, *see*

31

*supra* Section III.B.1.

Similarly, the Court is not persuaded by Plaintiff's arguments in favor of limited discovery. Plaintiff requests the Court for permission "to submit interrogatories to CBP" regarding five matters. *See* Pl.'s Opp'n at 27–28. Specifically, Plaintiff requests interrogatories for the following matters:

1. "Whether, in FOIA matters, CBP has engaged in a pattern and practice of denying the existence of responsive records only to later admit during litigation that responsive records exist";

2. "[I]n each of 2017, 2018, 2019, and 2020, in relation to how many FOIA requests did CBP initially deny that it had any responsive records only to admit during the course of litigation that responsive records exist?";

3. "The number of US citizens who were turned away from the Canadian border on each of January 19, 20, and 21, 2017";

4. "Any investigations conducted by CBP, the Department of Homeland Security or any other agency in relation [to] persons denied entry to the United States on January 19, 20 or 21, 2017, with special emphasis on the Buffalo Field Office and the Champlain, New York crossing area"; and

5. "Whether CBP has any documents it did not provide to Plaintiff relevant to Joseph DeCunha or Sasha Dyke or Koe Kroese, all of whom were identified in media reports as having been denied entry to the United States when they indicated that they wished to participate in the Women's March."

*Id.* According to Plaintiff, limited discovery is appropriate here because "CBP has acted in bad faith in responding to [Plaintiff's FOIA] Request and has demonstrated a pattern and practice of

being unresponsive to FOIA requests[.]" *Id.* at 27.

The Court has "broad discretion to manage the scope of discovery" in FOIA cases. *SafeCard Servs., Inc.*, 926 F.2d at 1200. Generally, "[d]iscovery in FOIA is rare and should be denied where an agency's declarations are reasonably detailed, submitted in good faith and the court is satisfied that no factual dispute remains." *Landmark Legal Found. v. EPA*, 959 F. Supp. 2d 175, 183 (D.D.C. 2013) (RCL) (quoting *Banker & Hostetler LLP v. Dep't of Com.*, 473 F.3d 312, 318 (D.C. Cir. 2006)). An exception applies when "the plaintiff raises a sufficient question as to the agency's good faith in processing documents." *Id.* at 184 (citation omitted). Here, Plaintiff's request for limited discovery is predicated on his belief that CBP has "acted in bad faith" and engages in a "pattern and practice of being unresponsive to FOIA requests." Pl.'s Opp'n at 27. For the reasons discussed above, *see supra* Section III.B.1, the Court is not persuaded by Plaintiff's allegations of bad faith. Given Ms. Suzuki's declarations and CBP's extensive *Vaughn* Index, the Court concludes that CBP's submissions were detailed enough and submitted in good faith. Accordingly, Plaintiff's request for discovery fails.

## IV.    CONCLUSION

For the reasons set forth in this Memorandum Opinion, the Court will **GRANT** CBP's [38] Renewed Motion for Summary Judgment and **DENY** Plaintiff's [40] Motion for *In Camera Ex Parte Inspection* and Limited Discovery. Finally, the Court will **DENY AS MOOT** Plaintiff's [48] Motion for Order Request for Ruling.

An appropriate order accompanies this Memorandum Opinion.

**Date:** November 15, 2023                    _____/s/_____
                                                                 COLLEEN KOLLAR-KOTELLY
                                                                 United States District Judge